Filed 6/22/16 Unmodified version attached

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JACK JERRY OCHOA,<br><br>    Defendant and Appellant. | H041918<br>(Santa Clara County<br>Super. Ct. No. 211398)<br><br>**ORDER MODIFYING OPINION**<br><br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on June 13, 2016, be modified as follows. The disposition shall be modified to add the following instructions: "On remand, the trial court shall vacate its March 28, 2012 order denying defendant's motion to dismiss the indictment, and the court shall enter a new order granting the motion to dismiss."


Dated:_____          _____

                                       Márquez, J.



                                       _____

                                       Rushing, P.J.



                                       _____

                                       Grover, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041918 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. 211398) |
| v. | |
| JACK JERRY OCHOA, | |
| Defendant and Appellant. | |

Defendant Jack Jerry Ochoa was the middleman in a drug ring supplying methamphetamine to the Nuestra Familia criminal street gang (Nuestra Familia). He received methamphetamine from his suppliers, stored it on his property, and sold it to the commanders of Nuestra Familia street regiments.

In 2008, the prosecution charged defendant and his suppliers with, among other things, conspiracy to distribute methamphetamine. The defendants who were charged in the 2008 complaint included no known members of Nuestra Familia, and the complaint charged no gang-related offenses or enhancements. After defendant pleaded no contest to conspiracy and possession charges, the trial court imposed a total sentence of 10 years in prison.

In April 2009, one month after defendant was sentenced in the 2008 case, the prosecution indicted him and 28 others for active participation in Nuestra Familia. The indictment once again charged defendant with conspiracy to distribute methamphetamine, but this time for the benefit of Nuestra Familia. Defendant moved to dismiss the indictment as a violation of the bar against multiple prosecutions set forth in Penal Code

section 654 and *Kellett v. Superior Court* (1966) 63 Cal.2d 822 (*Kellett*). After the trial court denied the motion, defendant moved to dismiss the indictment on double jeopardy grounds. The trial court denied that motion as well. Defendant then pleaded no contest to one count of conspiracy to distribute methamphetamine and admitted the offense was committed for the benefit of a criminal street gang. At sentencing, the court granted defendant's request for a certificate of probable cause limited to the claims raised herein.

Defendant appeals from the trial court's denial of his motions to dismiss on *Kellett* and double jeopardy grounds. We hold defendant's indictment was barred under *Kellett* and Penal Code section 654 because the prosecution was aware that the same course of conduct formed a significant part of the offenses charged in the 2008 complaint. Accordingly, we will reverse the judgment and vacate the conviction. We do not reach defendant's claim of double jeopardy.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Overview*

Defendant was a middleman and "stash house operator" in a methamphetamine distribution operation. He received large quantities of methamphetamine from Rudy "Gallo" Mendez and Jesus "Silent" Venegas, who procured the methamphetamine from México. Defendant stored the methamphetamine on his property and sold it to members of Nuestra Familia, a criminal street gang operating in Santa Clara County and nearby areas. Defendant's primary customer was Lorenzo "Lencho" Guzman, the commander of a Nuestra Familia street regiment in San José. Defendant also supplied methamphetamine to at least two other regiment commanders and other members of Nuestra Familia.

The prosecution charged defendant in two separate cases alleging two different conspiracies. First, in 2008, the prosecution charged defendant in a 12-defendant complaint including Mendez, Venegas, and others, but not including members of Nuestra Familia. We will refer to this case (Santa Clara County Superior Court Docket

2

No. CC805059) as the "Mendez-Venegas prosecution." Defendant pleaded no contest to conspiracy to distribute methamphetamine and other charges, and the trial court sentenced him in March 2009.

Then, in April 2009, the prosecution indicted defendant and 28 others for active participation in Nuestra Familia and conspiracy to distribute methamphetamine for the benefit of the gang. We will refer to this case (Santa Clara County Superior Court Docket No. 211398) as the "Nuestra Familia prosecution."

B. *The Mendez-Venegas Prosecution*

Investigation in the Mendez-Venegas case was conducted by the Bureau of Narcotic Enforcement (BNE), the federal Drug Enforcement Agency, and the San José Police Department. Members of the San José Police Department were made aware of the Mendez-Venegas distribution ring as early as August 2007. On August 10, 2007, BNE agents conducted a warrant search of a residence in San José and seized 17 pounds of crystal methamphetamine. Agents arrested the resident, who identified Mendez and Venegas as the leaders of a drug trafficking ring in San José. Several days later, BNE agents met with Detective Juan Vallejo of the Narcotic and Covert Investigations unit of the San José Police Department. Detective Vallejo gave the agents an organizational chart identifying Mendez as the head of the organization, with Venegas as his "right hand man," and defendant as a "stash house" operator. Detective Vallejo further identified defendant as an active member of Nuestra Familia.

On November 25, 2007, Detective Vallejo informed BNE agents that Venegas and Mendez were traveling to Guadalajara to meet with a drug source. Venegas and Mendez planned to drive to the Tijuana border, cross into México, and fly to Guadalajara. Venegas was carrying $90,000 to pay the drug source. The police immediately initiated surveillance of Venegas's residence in San José. They observed Mendez and Venegas leave in a vehicle together and drive southbound on Interstate 5 as far as Coalinga, whereupon police terminated their surveillance.

3

On May 13, 2008, investigators arrested defendant and several others for operating an international methamphetamine distribution ring in Santa Clara County. In defendant's apartment, police found a pound of methamphetamine, a loaded semiautomatic pistol, 12 cell phones, $23,310 in cash, a scale, and materials commonly used to process methamphetamine.

The prosecution charged defendant, Mendez, Venegas, and nine other codefendants with possession of methamphetamine and conspiracy to distribute methamphetamine, among other charges. The complaint alleged the conspiracy took place between February 11, 2008, and May 13, 2008. The prosecution considered Mendez to be the leader of the conspiracy, with Venegas operating as his right hand man. Mendez and Venegas were principally involved in procuring the methamphetamine, most of which they obtained in large quantities from a source in México. Defendant's role involved holding or storing the methamphetamine and transferring it to buyers. He also cut the methamphetamine to reduce its purity and converted methamphetamine in powder form to crystal methamphetamine before providing it to his buyers.

On October 2, 2008, the parties reached a plea agreement whereby defendant pleaded no contest to four counts: (1) possession of methamphetamine for sale (Health & Saf. Code, § 11378); (2) conspiracy to distribute methamphetamine (Pen. Code, § 182, subd. (a)(1); Health & Saf. Code, § 11379, subd. (a)); (3) possession of a firearm by a felon (Pen. Code, § 12021, subd. (a)(1)); and (4) possession of a controlled substance while armed with a loaded firearm (Health & Saf. Code, § 11370.1). As to the first count, defendant admitted allegations that he was personally armed with a firearm in the commission of the offense. (Pen. Code, § 12022, subd. (c).) He further admitted having a prior "strike" conviction. (Pen. Code, §§ 667, subds. (b)-(i), 1170.12.) In March 2009, the trial court imposed a total term of 10 years in prison.

C. *The Nuestra Familia Prosecution*

1. *The Nuestra Familia Investigation*

The investigation of Nuestra Familia began in 2004 and involved the San José Police Department, the Santa Clara County Specialized Enforcement Team, and the Campbell Police Department. The investigation was led primarily by Sergeant T.J. Lewis of the San José Police Department and Sergeant Dan Livingston of the Campbell Police Department.

The Nuestra Familia organization operated as a hierarchy with three "generals" at the head. The generals—inmates at Pelican Bay State Prison and a supermax prison in Colorado—issued orders to the commanders of multiple street regiments operating in Santa Clara County and nearby areas. Investigators identified four regiment commanders in the course of their investigation: Lorenzo "Lencho" Guzman, Sammy "Black" Ramirez, Charlie "Brown" Campa, and James Cramer. Clayton "Shorty" Clark operated as Guzman's second in command, and Marco "Huero" Abundiz operated as Campa's second in command.

Investigators conducted the Nuestra Familia investigation with the assistance of Debbie Corrales Guzman, Guzman's wife.[1] Corrales began cooperating with investigators around December 2007. She provided Sergeant Lewis with information on the structure and operations of Nuestra Familia, and police recorded phone calls between Corrales and various targets, including defendant. Corrales saw defendant supply methamphetamine to Guzman and to other high-level Nuestra Familia members, including Ramirez, Campa, and Abundiz.

---

[1] We refer to Debbie Corrales Guzman as Corrales to avoid confusion.

## 2. *Timeline of Defendant's Involvement*

Defendant and Venegas met in high school sometime around the early 1990s. Defendant also went to school with Ramirez's sister. Defendant admitted he was a member of the Varrio Horseshoe street gang when he was younger, but most witnesses in the record stated defendant was never a member of Nuestra Familia.

According to Campa, defendant began supplying methamphetamine to Nuestra Familia around 2005. Corrales told police she witnessed multiple drug transactions between defendant, Guzman, and other Nuestra Familia members beginning in the fall of 2005. Guzman would take Corrales with him to Abundiz's house, where defendant delivered methamphetamine in two-gallon freezer bags on a weekly basis. Defendant "fronted" the drugs and received cash at a later time after the drugs were resold down the distribution chain.

On March 8, 2007, police arrested Guzman for possession of a firearm; he remained in custody thereafter. But Guzman continued to coordinate his distribution operations through Corrales and his second in command, Clayton Clark. Corrales received large amounts of cash from various persons, stored it in her residence, and passed it on to defendant. During this period, police recorded multiple phone calls between Guzman and Corrales evidencing the ongoing transactions.

In July 2007, Clark was involved in a homicide and fled to México. Corrales nonetheless continued to communicate with Clark, with the latter calling her from México or sending messages through intermediaries. During that period, various people continued coming to Corrales' house to drop off money intended for Guzman. In turn, defendant would go to Corrales' house to pick up money owed to him by Guzman. Corrales testified that people owed Guzman money because defendant was still delivering methamphetamine to whomever Guzman had put in charge.

At some point during this period, defendant began to fall increasingly out of favor with Campa and Ramirez, two of the other regiment commanders. Ramirez attempted to

6

secure a supply of methamphetamine from defendant, but defendant demurred and informed Ramirez "that he is not a homeboy but a go between." Defendant's response angered Ramirez, and Ramirez warned defendant that Nuestra Familia would stop providing him with protection from his enemies, "thus having a negative impact on his drug networking."

In December 2007, police executed a warrant search of Corrales' residence. Police informed Corrales they had been recording the incriminating phone calls between her and Guzman. At that point, Corrales began cooperating with the Nuestra Familia investigation.

On January 22, 2008, police arranged a recorded phone call between Corrales and defendant. Defendant and Corrales alluded to the fact that "Brown and Black" (Campa and Ramirez) had been hindering defendant's ability to sell methamphetamine. Corrales told defendant that Guzman had sent a message to Campa and Ramirez asking them to allow defendant to continue his distribution activities. Defendant said he did not trust Campa and Ramirez, and he complained that Guzman, being in custody, "ain't got no say over what we do out here." Defendant told Corrales to inform Guzman that he (defendant) would make an effort to "get out there," but he wanted to speak directly with Campa and Ramirez first.

On February 19, 2008, police arranged another recorded phone call between defendant and Corrales. Defendant told Corrales he had not yet spoken with Campa or Ramirez, and he believed they would not comply with Guzman's request. Defendant stated, "It's one thing to be cleared but when these guys have it in for you and they don't want you around they're gonna find a way for you not to be around." Defendant explained, "they can become problems if I start working." He added that he had recently suffered "a couple of big losses" and he could not afford to get "burned" because he lacked the money to pay his suppliers. Defendant added, "I've tried and tried and things

7

just aren't working out for me." Defendant further explained that his suppliers were charging much higher prices for the methamphetamine.

Defendant lamented the fact that Guzman was in custody and stated, "if Lencho was out I would be working right now you know why because I know I could depend on Lencho." Defendant stated, "I'm not working at all I'm not doing nothing the only thing I do now and then is I'll hold something for one of my partners or something to that extent but I'm not out on the streets." Defendant then told Corrales to tell Guzman that he (defendant) was willing to keep distributing to Guzman if the right conditions arose. Defendant said that "things are fruitful for when opportunity arises" because he was still in good standing with his suppliers and was "just waiting for an opportunity."

On May 13, 2008, police arrested defendant and searched his residence as part of the Mendez-Venegas investigation.

### 3. *The Nuestra Familia Indictment*

In April 2009, the prosecution indicted defendant, Guzman, Clark, and 26 other codefendants in a 13-count indictment alleging, among other things, that the defendants were active participants in Nuestra Familia. (Pen. Code, § 186.22, subd. (a).) The indictment further charged the defendants with operating a conspiracy to distribute methamphetamine with the allegation that they did so for the benefit of the gang. (Pen. Code, §§ 182, 186.22, subd. (b)(1)(A); Health & Saf. Code, § 11379, subd. (a).)

### 4. *Defendant's Motion to Dismiss the Indictment Under Kellett*

In March 2012, defendant moved to dismiss the indictment under Penal Code section 654 (Section 654) and *Kellett*, *supra*. Defendant argued that the prosecution was aware of the evidence and facts showing he supplied Nuestra Familia with methamphetamine at the time of the Mendez-Venegas prosecution, such that any charges relating to the Nuestra Familia prosecution should have been brought against him in the earlier prosecution.

8

In a written opposition, the prosecution made several assertions to support its argument that "the two cases were investigated by different agencies and were completely separate and distinct investigations into two different large scale drug operations, involving different co-defendants." The prosecution asserted: (1) defendant was not charged with any gang-related offenses or enhancements in the Mendez-Venegas prosecution because "there was no evidence collected to identify any of the defendants as gang members or that the crime was done for the benefit of, at the direction of[,] or in association with a criminal street gang"; (2) the Nuestra Familia prosecution was based on "new and different evidence" than the evidence gathered in the Mendez-Venegas prosecution; (3) "police and prosecutors were not aware of the extensive role Defendant Ochoa played in the Nuestra Familia Organization at the time of the investigation and prosecution" of the Mendez-Venegas prosecution; and (4) "None of the information or evidence collected as a result of BNE's investigation of #CC805059 [the Mendez-Venegas prosectution] was presented to the Grand Jury in #211398 [the Nuestra Familia prosecution]."

At a hearing on the matter, the trial court focused on whether the conduct at issue in the two prosecutions constituted a single course of conduct under Section 654. Defendant argued that, as a middleman in two cases involving the same supply chain of methamphetamine, his actions constituted "a continuous, unitized course of conduct." Among other things, defendant cited the probation report filed in the Mendez-Venegas prosecution, which stated: "Investigators believe the defendant, Jack Ochoa, was the connection between the Nuestra Familia and codefendants Rudy Mendez Jr. and Jesus Venegas, and worked closely with both." In response, the prosecution argued that the two cases involved "two separate and distinct conspiracies." Specifically, the prosecution asserted that defendant, in 2008, was supplying methamphetamine to someone outside of Santa Clara County who was not associated with Nuestra Familia. The prosecution claimed there was no evidence that defendant supplied any drugs to

9

Guzman or his regiment after July 2007 because Guzman had been arrested by then, and Clark, his second in command, had fled the country.

The trial court denied the motion. The court noted that the Mendez-Venegas complaint did not include any allegations of involvement by Nuestra Familia, and the two prosecutions involved different coconspirators. The court found that the objective and intent of the Mendez-Venegas conspiracy "was really nothing more than mere profit." By contrast, the court described that the focus of the Nuestra Familia prosecution was on the gang's activities and the commission of overt acts for the benefit of the gang. Because the intent and objectives of the Nuestra Familia conspiracy (to benefit the gang) were distinct from the intent and objectives of the Mendez-Venegas conspiracy (mere profit), the court found that the two prosecutions targeted two separate, distinct conspiracies.

5. *Subsequent Trial Court Proceedings*

After the trial court denied defendant's *Kellett* motion, defendant moved to dismiss the indictment on double jeopardy grounds. He simultaneously moved for reconsideration of the denial on *Kellett* grounds. The trial court denied both motions. In denying the motion on double jeopardy grounds, the court reiterated its prior finding that the two prosecutions involved two separate and distinct offenses based upon two separate and distinct agreements.

In April 2012, defendant pleaded no contest to one count of conspiracy to distribute methamphetamine. (Pen. Code, § 182; Health & Saf. Code, § 11379, subd. (a).) He admitted the allegation that the offense was committed for the benefit of a criminal street gang. (Pen. Code, § 186.22, subd. (b)(1)(A).) He further admitted he had suffered a prior serious felony conviction and had served two prior prison terms. (Pen. Code, §§ 667, subd. (a), 667.5, subd. (b).) Under the terms of the plea agreement, the parties agreed defendant would be sentenced to a total term of 11 years, but the court would also resentence him on the Mendez-Venegas conviction from a term of 10 years to

10

a term of four years four months. The parties agreed that the latter term would run consecutive to the 11-year term for a total term of 15 years four months. The parties also agreed defendant would be allowed to appeal the denial of his motions to dismiss on *Kellett* and double jeopardy grounds. Furthermore, the trial court would allow defendant to augment the record with evidence relating to these motions for the purposes of his appeal.

Before defendant was sentenced, his trial counsel declared a conflict of interest and withdrew from the case. The court then appointed new trial counsel, who filed an "Augmented Statement of Facts and Accompanying Exhibits" with evidence relating to the *Kellett* and double jeopardy issues. In response, the prosecution also filed an augmentation of the record including, among other things, a sworn declaration from Sergeant Lewis, and the testimony of Corrales, Ramirez, and Clark as adduced at Guzman's jury trial.

In October 2014, the trial court denied probation and sentenced defendant to a term of 11 years in state prison for the Nuestra Familia conviction.[2] The term consisted of four years on the conspiracy count plus two years for the gang enhancement and five years for the prior serious felony conviction. The court struck the prior prison term enhancements. The court also granted defendant a certificate of probable cause to appeal the denial of his motions to dismiss on *Kellett* and double jeopardy grounds.

## II. DISCUSSION

Defendant contends the trial court erred by denying his motion to dismiss under *Kellett* because the course of conduct underlying the offenses charged in the Mendez-Venegas prosecution was the same course of conduct for which he was indicted in the Nuestra Familia prosecution. Defendant argues that the prosecution was aware or should have been aware of the evidence connecting the two cases, such that Section 654

---

[2] Although the parties agreed defendant would be resentenced for the Mendez-Venegas conviction, the record on appeal contains no record of the resentencing.

11

prohibited multiple prosecutions. The Attorney General contends the trial court properly denied defendant's *Kellett* motion because the two prosecutions did not involve the same course of conduct. She argues the two cases involved two separate conspiracies occurring at different times and places with different coconspirators and different objectives.

A. *Legal Principles*

  1. *Section 654 and Kellett*

Subdivision (a) of Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other." "Section 654 addresses both multiple punishment and multiple prosecution. The separate concerns have different purposes and different rules of prohibition." (*People v. Valli* (2010) 187 Cal.App.4th 786, 794 (*Valli*).) "Section 654's preclusion of multiple prosecution is separate and distinct from its preclusion of multiple punishment. The rule against multiple prosecutions is a procedural safeguard against harassment and is not necessarily related to the punishment to be imposed; double prosecution may be precluded even when double punishment is permissible." (*Neal v. State of California* (1960) 55 Cal.2d 11, 21 (*Neal*), disapproved on other grounds in *People v. Correa* (2012) 54 Cal.4th 331.)

*Kellett, supra,* is the leading case construing Section 654's bar against multiple prosecutions. In *Kellett*, the California Supreme Court held that when "the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding unless joinder is prohibited or severance permitted for good cause. Failure to unite all such offenses will result in a bar to subsequent prosecution of any offense omitted if the

12

initial proceedings culminate in either acquittal or conviction and sentence." (*Kellett*, *supra*, 63 Cal.2d at p. 827, fn. omitted.) The purpose of this bar is to prevent the needless harassment and waste of resources that may result from multiple prosecutions for the same act or course of conduct: "If needless harassment and the waste of public funds are to be avoided, some acts that are divisible for the purpose of punishment must be regarded as being too interrelated to permit their being prosecuted successively." (*Ibid*.)

The bar on multiple prosecutions sweeps more broadly than the prohibition on multiple punishments under Section 654: "When there is a course of conduct involving several physical acts, the actor's intent or objective and the number of victims involved, which are crucial in determining the permissible punishment, may be immaterial when successive prosecutions are attempted." (*Kellett*, *supra*, 63 Cal.2d at p. 827; cf. *Neal*, *supra*, 55 Cal.2d at p. 19 [whether a course of criminal conduct is divisible and therefore gives rise to more than one act for the purposes of multiple punishments under Section 654 depends on the intent and objective of the actor].) However, "[t]he *Kellett* rule applies only where 'the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part.' " (*Valli*, *supra*, 187 Cal.App.4th at p. 796, quoting *Kellett*, at p. 827.) The rule may apply even if multiple prosecutors act independently in charging the defendant, such that no single prosecutor is aware of the multiple prosecutions. The duty to join is particularly strong where the multiple offenses are serious in nature. "When both offenses are serious crimes, the potential for harassment and waste is sufficiently strong that section 654 imposes on prosecutors an administrative duty to insure that the charges are joined." (*In re Dennis B.* (1976) 18 Cal.3d 687, 694.)

Appellate courts have adopted two different tests under *Kellett* to determine whether multiple offenses occurred during the same course of conduct. (*Valli*, *supra*, 187 Cal.App.4th at p. 797.) Under one line of cases, multiple prosecutions are not barred if the offenses were committed at separate times and locations. (*People v. Douglas*

13

(1966) 246 Cal.App.2d 594, 599 (*Douglas*) [no bar to multiple prosecution where each offense had a separate beginning, duration, and end, none of which overlapped]; *People v. Ward* (1973) 30 Cal.App.3d 130, 136 [no bar to multiple prosecution where crimes were committed at different locations, at different times, against different victims, and with different objectives]; *People v. Cuevas* (1996) 51 Cal.App.4th 620, 624 [no bar to multiple prosecution for offenses committed at different times and at different places]; cf. *People v. Britt* (2004) 32 Cal.4th 944, 955 [multiple prosecutions barred where registered sex offender moving from one county to another failed to notify both counties of his change in residence].)  We will refer to this as the "time and place test."

A second version of the test—the "evidentiary test"—looks to the evidence necessary to prove the offenses.  (*People v. Flint* (1975) 51 Cal.App.3d 333 (*Flint*).)  "[I]f the evidence needed to prove one offense necessarily supplies proof of the other, [. . .] the two offenses must be prosecuted together, in the interests of preventing needless harassment and waste of public funds."  (*People v. Hurtado* (1977) 67 Cal.App.3d 633, 636 (*Hurtado*).)  "The evidentiary test of *Flint* and *Hurtado* requires more than a trivial overlap of the evidence.  Simply using facts from the first prosecution in the subsequent prosecution does not trigger application of *Kellett*."  (*Valli*, *supra*, 187 Cal.App.4th at p. 799.)

Whether the bar against multiple prosecution applies must be determined on a case-by-case basis.  (*People v. Britt*, *supra*, 32 Cal.4th at p. 955.)  We review factual determinations under the deferential substantial evidence test, viewing the evidence in the light most favorable to the prosecution.[3]  (*Valli*, *supra*, 187 Cal.App.4th at p. 794.)  We review de novo the legal question of whether Section 654 applies.  (*Ibid.*)

_____

[3] While the trial court made few factual findings, our review is complicated by the fact that much of the evidence in the record was not before the trial court when it ruled on the *Kellett* motion.  Generally, the moving party bears the burden to put the supporting evidence before the court.  But as described above, the parties agreed to augment the record after defendant's initial trial counsel withdrew due to an unspecified conflict.  The

14

2. *The Law of Conspiracy*

"Pursuant to [Penal Code] section 182, subdivision (a)(1), a conspiracy consists of two or more persons conspiring to commit any crime. A conviction of conspiracy requires proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act 'by one or more of the parties to such agreement in furtherance of the conspiracy." (*People v. Morante* (1999) 20 Cal.4th 403, 416, fn. omitted., (*Morante*).) "Criminal conspiracy is an offense distinct from the actual commission of a criminal offense that is the object of the conspiracy." (*Ibid.*) "Conspiracy is an inchoate crime. [Citation.] It does not require the commission of the substantive offense that is the object of the conspiracy. 'As an inchoate crime, conspiracy fixes the point of legal intervention at [the time of] agreement to commit a crime,' and thus reaches further back into preparatory conduct than attempt . . . .' " (*People v. Swain* (1996) 12 Cal.4th 593, 599, quoting Model Pen. Code & Commentaries (1985) com. 1 to § 5.03, pp. 387-388.)

" 'A conspiracy is not the commission of the crime which it contemplates, and neither violates nor "arises under" the statute whose violation is its object.' " (*People v. Vargas* (2001) 91 Cal.App.4th 506, 552, quoting *Braverman v. United States* (1942) 317 U.S. 49, 54. (*Braverman*).) " 'Whether the object of a single agreement is to commit one or many crimes, it is in either case that agreement which constitutes the conspiracy which the statute punishes. The one agreement cannot be taken to be several agreements and hence several conspiracies because it envisages the violation of several statutes rather than one.' " (*Ibid.*) Thus, "a single agreement to commit a number of crimes is only one conspiracy, regardless of the number of crimes sought to be committed, or that are committed, under that conspiracy." (*Id.* at p. 555.) " ' "[T]he government cannot split up

Attorney General does not object to our reliance on the augmented record, and her brief relies on portions of the record augmented by the prosecution.

15

one conspiracy into different indictments, and prosecute all of them, but that prosecution for any part of a single crime bars any further prosecution based upon the whole or a part of the same crime." ' " (*People v. Lopez* (1994) 21 Cal.App.4th 1551, 1557, quoting *In re Nichols* (1927) 82 Cal.App. 73, 79.)

"The crime of conspiracy can be committed whether the conspirators fully comprehended its scope, whether they acted together or in separate groups, or whether they used the same or different means known or unknown to them." (*People v. Cooks* (1983) 141 Cal.App.3d 224, 312.) A single conspiracy may exist even if some conspirators are unaware of the identity or existence of other coconspirators. (*Blumenthal v. United States* (1947) 332 U.S. 539, 556-557; *People v. Van Eyk* (1961) 56 Cal.2d 471, 479; *People v. Aday* (1964) 226 Cal.App.2d 520, 534, citing *People v. Buffum* (1953) 40 Cal.2d 709, 729, overruled on other grounds by *Morante*, *supra*, 20 Cal.4th 403.)

B. *Application of Section 654 and Kellett*

The central question in this case is whether "the same act or course of conduct play[ed] a significant part" in the offenses charged in both prosecutions. (*Kellett*, *supra*, 63 Cal.2d at p. 827.) For the reasons set forth below, we answer this question in the affirmative. We then consider whether, at the time of the Mendez-Venegas prosecution, the prosecution was aware or should have been aware that the same course of conduct forming the basis for the Mendez-Venegas complaint formed the basis for the charges alleged in the Nuestra Familia indictment.

1. *Both Prosecutions Concerned the Same Course of Conduct*

In both prosecutions, defendant was charged with conspiracy to distribute methamphetamine. The Mendez-Venegas complaint also charged defendant with possession of methamphetamine for sale, conspiracy to transport methamphetamine, possession of methamphetamine while armed, manufacturing methamphetamine, possession of a firearm by a felon, and possession of ammunition by a felon. And the

16

Nuestra Familia indictment charged defendant with active participation in Nuestra Familia, and the indictment alleged the conspiracy to distribute methamphetamine was committed for the benefit of that gang.

At the outset, we note that most of the offenses charged in the Mendez-Venegas complaint were substantive offenses committed in furtherance of the methamphetamine conspiracy—e.g., possession with intent to distribute, possession of methamphetamine while armed, conspiracy to transport, and conspiracy to manufacture. Defendant does not argue that *Kellett* requires dismissal of any of the charges alleged in that complaint. And although the Nuestra Familia indictment charged defendant with *active participation* in Nuestra Familia, the defense and prosecution agreed that defendant was not actually a member of Nuestra Familia. There is no evidence defendant received commands from Nuestra Familia generals, issued orders to street regiment members, or committed any other crime for the benefit of the gang apart from methamphetamine distribution.

At the hearing on the *Kellett* motion, the prosecutor argued: "Jack Ochoa is not a member of the Nuestra Familia. He's not a member of the Nuestra Raza. He's a large scale drug dealer who is supplying Mr. Guzman." To the extent defendant actively participated in Nuestra Familia, his role appeared limited to supplying the gang with methamphetamine. We note that as part of defendant's plea agreement in the Nuestra Familia case, the prosecution agreed to dismissal of the charge of active participation in a criminal street gang.

The conduct at issue here involves defendant's participation in the alleged conspiracies to distribute methamphetamine as well as the ancillary substantive offenses he committed to further the Mendez-Venegas conspiracy, such as possessing and transporting methamphetamine.[4] The question is whether the defendant's conduct as part

---

[4] In the event the prosecution elects to file a new indictment against defendant for his participation in Nuestra Familia, nothing in this opinion would foreclose such an indictment based on conduct unrelated to methamphetamine distribution.

17

of the Nuestra Familia conspiracy is a significant part of the course of conduct that formed the basis for the Mendez-Venegas conspiracy or the substantive offenses charged in the Mendez-Venegas complaint.

As set forth above in Section II.A.1., appellate courts have set forth two tests—the "time and place test" and the "evidentiary test"—to analyze a defendant's course of conduct under *Kellett*. Rather than deciding which test controls, we will apply both.

### a. *The Time and Place Test*

Under the time and place test, multiple prosecutions are not barred if the offenses were committed at separate times and locations. We will begin by focusing on the time frames underlying the drug distribution conspiracies.

Based on the Mendez-Venegas complaint and the Nuestra Familia indictment, the alleged conspiracies overlapped in time. The Nuestra Familia indictment alleged the conspiracy took place between April 25, 2002, and April 23, 2009. The Mendez-Venegas complaint alleged the conspiracy took place within that same time period— between February 11, 2008, and May 13, 2008. Furthermore, both charging documents alleged the conspiracies took place in Santa Clara County. But for purposes of a *Kellett* analysis, we must *also* look to the facts of defendant's conduct underlying the charged offenses.

The record establishes that defendant began supplying methamphetamine to Nuestra Familia in 2005. Both Corrales and Campa stated this fact. Corrales witnessed defendant supplying methamphetamine to Guzman and Abundiz in two-gallon freezer bags during multiple meetings starting in the fall of 2005. The record establishes that Mendez and Venegas were defendant's only source for methamphetamine, such that the methamphetamine defendant supplied to Nuestra Familia was the same methamphetamine he obtained from Mendez and Venegas. The prosecution's augmentation of the record establishes this fact in a sworn declaration from Campa stating: "While Jack Ochoa was not a member of the NF, he supplied the NF with drugs

18

he received from a supplier, Rudy Mendez."  Campa's declaration further states, "I was aware that *Mendez was Ochoa's sole supplier* of narcotics . . . ."  (Italics added.)  The record holds an abundance of evidence corroborating these statements.  But in its augmentation to the record, the prosecution offered the sworn declaration of Sergeant Lewis, who stated "[t]hat in my expert opinion, large scale methamphetamine suppliers like JACK OCHOA almost always have multiple sources of supply for their methamphetamine in order to maintain a constant supply of the illegal narcotic."  Apart from this statement, there is no other evidence in the record to support Sergeant Lewis' claim with respect to defendant or his supply of methamphetamine.  Nor did the prosecution identify any other supplier of methamphetamine to defendant.

We thus conclude defendant was supplying Nuestra Familia with the same methamphetamine he procured from Mendez and Venegas.  Furthermore, there is no evidence defendant was supplying any other party apart from Nuestra Familia with methamphetamine in 2005.  These facts compel the conclusion that in 2005 defendant entered a conspiracy to obtain methamphetamine from Mendez and Venegas at the same time he entered a conspiracy to supply Nuestra Familia with methamphetamine.  It appears this chain of distribution continued actively until sometime in late 2007 or early 2008, by which time Guzman had been taken into custody and Clark had fled to México.  Faced with resistance from regiment commanders Campa and Ramirez, it appears defendant was unable to sell methamphetamine around the time of his phone calls with Corrales in January and February 2008.

The Attorney General, echoing the arguments of the prosecution below, contends the Mendez-Venegas conspiracy did not occur at the same time as the Nuestra Familia conspiracy because defendant was no longer supplying methamphetamine to Nuestra Familia as of 2008.  This argument misunderstands the nature of conspiracy.  The core conduct underlying the offense of conspiracy is the entry into an *agreement* to commit an offense, together with any overt act in furtherance of the conspiracy.  The fact that

19

defendant was supplying Nuestra Familia with methamphetamine he obtained from Mendez and Venegas over the same period of time—from 2005 until sometime in 2007 or 2008—shows he had entered into agreements with both sides of the supply chain as of 2005. As soon as overt acts were committed in furtherance of the distribution, the conspiracy or conspiracies were established.

The fact that defendant may have stopped distributing methamphetamine to Nuestra Familia at some point in late 2007 or early 2008 did not end his participation in the Nuestra Familia conspiracy. The actual distribution of a drug is not the same as a conspiracy to distribute the drug. (*Braverman*, *supra*, 317 U.S. at p. 54 [a conspiracy is not the commission of the crime which it contemplates].) Furthermore, upon joining a conspiracy, a defendant's membership in the ongoing conspiracy continues until he affirmatively rejects or repudiates the conspiracy. (*People v. Crosby* (1962) 58 Cal.2d 713, 730.) Not only did defendant fail to withdraw from the conspiracy, he explicitly reaffirmed his agreement to continue supplying methamphetamine to Nuestra Familia. In his phone call with Corrales on February 19, 2008, defendant instructed Corrales to tell Guzman he wished to continue selling methamphetamine and he was "just waiting for an opportunity." As he explained to Corrales, whatever obstacles he faced in supplying methamphetamine to Nuestra Familia were temporary and unintended. Thus, by his own admission, defendant was still engaged in the conspiracy as of February 2008.

The prosecution asserted defendant was selling methamphetamine to some other party located outside Santa Clara County in 2008, but it never identified any such buyer. The fact that defendant had methamphetamine in his residence in May 2008 is consistent with his recorded statement to Corrales that he was storing methamphetamine for his suppliers. The only evidence in the record that defendant sold methamphetamine to some other party is a single statement in Campa's declaration that "[t]he NF was not . . . Ochoa's only customer." That statement provides no further details and specifies no time frame or location for any drug sales by defendant to anyone outside Nuestra Familia. But

20

even assuming defendant had supplied methamphetamine to someone outside Nuestra Familia during the relevant time period, this would not have changed the fact that he was still engaged in both the Mendez-Venegas and Nuestra Familia conspiracies at the same time.

Moreover, the record does not support the Attorney General's contention that the distribution network constituted two separate conspiracies with different coconspirators. " 'One agreement gives rise to only a single offense, despite any multiplicity of objects.' " (*People v. Lopez*, *supra*, 21 Cal.App.4th at p. 1557, quoting 1 Witkin and Epstein, California Criminal Law (2d ed. 1988) Elements of Crime, section 163, at p. 181.) "The test is whether there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy. If so, there is but a single conspiracy." (*People v. Skelton* (1980) 109 Cal.App.3rd 691, 718).

As a general matter, multiple members of a narcotics supply chain are all members of a single conspiracy because they have all entered into an overall agreement to distribute drugs, even if some members are unaware of the presence or identity of other members. "It has been held that persons can be prosecuted as conspirators if, by buying, selling, or doing some other act, they knowingly participated in a general plan to place narcotics in the hands of ultimate users. [Citations.] The fact that defendant may not have personally known the identity or exact functions of all the members of the conspiracy is immaterial." (*People v. Van Eyk*, *supra*, 56 Cal.2d at p. 479.)

In this case, the relationships between the members of the supply chain were actually known by participants on both sides of the chain. The record shows that multiple members of Nuestra Familia were aware of the identity of defendant's suppliers. John "Boxer" Mendoza, a former Nuestra Familia regiment commander, began cooperating with police in October 2007. Mendoza provided police with a handwritten document identifying the members of four Nuestra Familia street regiments operating in Santa Clara County. Mendoza identified defendant, Mendez, Venegas, and Angel Palacios (another

21

codefendant in the Mendez-Venegas prosecution) as some of Guzman's methamphetamine suppliers.

Another Nuestra Familia member, Patrick "Turtle" Martinez, began cooperating with police in January 2008. According to a police report drafted in June 2008, Martinez told police defendant was providing up to 20 pounds of methamphetamine each month to Guzman's street regiment. Martinez also identified Venegas as an associate of defendant, and he stated that both defendant and Venegas had been arrested by the BNE for operating a large scale methamphetamine operation.

The evidence also shows that Guzman personally entered into an agreement with either Mendez or Venegas to supply Nuestra Familia with methamphetamine. At Guzman's trial, Corrales testified that defendant's methamphetamine supplier, whom she called "border brother," met with Guzman at their house because Guzman wanted to "get to him." The supplier did not speak English, so the two spoke in Spanish while seated on the couch. In an earlier interview with Sergeant Lewis, Corrales explained the circumstances of the meeting as follows: "Jack was giving them, giving it to 'em real cheap. Then one day Jack decided he was gonna step back because something happened. I don't remember what happened and he, and [Guzman] was on him and on him and on him to introduce him to the border connection. Jack finally agreed he would cause he was gonna step back for a minute [. . .] and the border connection finally agreed he'd meet [Guzman] because he realized that [Guzman] was making all his money for him and then once [Guzman] and that border [connection] met, it was on after that." Corrales stated that at that point "the border guy" started delivering methamphetamine to Guzman's house. In another interview with police, Corrales described seeing defendant's source in three different meetings with Guzman. Corrales described the source as "30 something" and "dark" with a full set of hair and nice clothes. On one occasion, Corrales saw the source in Guzman's living room. Guzman told her, "That's the main dude I've been trying to hook up with."

This evidence suggests that defendant, Mendez, Venegas, and Guzman were all part of a common agreement to distribute the same methamphetamine. But we need not decide whether defendant was part of two conspiracies or only one; the issue under *Kellett* is whether his *course of conduct* played a significant part in both cases. The evidence shows that defendant's course of conduct in both cases took place at the same times and in the same places. By agreeing to receive methamphetamine from Mendez and Venegas and storing them on his property, defendant was simultaneously furthering the Nuestra Familia conspiracy because the same drugs were intended to be sold to Guzman and other Nuestra Familia members. Conversely, by agreeing to supply the methamphetamine to Nuestra Familia, defendant was simultaneously furthering the Mendez-Venegas conspiracy because the same money paid to him by Guzman could be used to buy the drugs from Mendez and Venegas. We conclude from this evidence that, under the time and place test, defendant's course of conduct formed a significant part of the offenses charged in both prosecutions.

b. *The Evidentiary Test*

Under the evidentiary test, we consider whether the evidence needed to prove one offense necessarily supplies proof of the other. (*Hurtado*, *supra*, 67 Cal.App.3d at p. 636.) The evidentiary test requires "more than a trivial overlap of the evidence." (*Valli*, *supra*, 187 Cal.App.4th at p. 799.) The record shows the overlap in the evidence was substantial.

First, as set forth above, investigators in the Mendez-Venegas prosecution identified defendant's connection to Nuestra Familia as early as August 2007. Second, multiple witnesses in the Nuestra Familia prosecution identified both defendant and his suppliers as participants in the same distribution network. Former regiment commander Mendoza identified defendant, Mendez, Venegas, and Angel Palacios (another codefendant in the Mendez-Venegas prosecution) as Guzman's methamphetamine suppliers. Former Nuestra Familia member Martinez also identified defendant as a

23

supplier to Nuestra Familia and identified Venegas as his associate. In addition, Corrales provided police with abundant information about defendant's role as a middleman, and the recorded phone calls between her and defendant contained numerous references to defendant's suppliers. While Corrales did not provide investigators with the names of defendant's suppliers, she personally witnessed Guzman meeting with either Mendez or Venegas on multiple occasions, as noted earlier.

The physical evidence collected in the Mendez-Venegas investigation also supplied proof of defendant's role as a middleman in the chain of supply to Nuestra Familia. As set forth above, police in the Mendez-Venegas investigation seized a pound of methamphetamine and other evidence of drug distribution in defendant's residence on May 13, 2008. The prosecution presented this evidence to the Nuestra Familia grand jury through the testimony of Officer Doug Tran of the San José Police Department, who participated in the search.[5] Officer Tran testified to the same facts again at Guzman's jury trial, even though defendant was neither a witness nor a defendant in that trial.[6]

The evidence noted above was sufficient to support a conspiracy conviction for defendant's role as a middleman, regardless of whether the conspiracy was charged based on defendant's connections to Mendez-Venegas or Nuestra Familia. We thus conclude the record establishes more than a trivial overlap in the evidence supporting both prosecutions. Furthermore, we note that the overlap in the known evidence was likely much greater than reflected in the record because investigators deliberately redacted or

---

[5] This fact contradicts the prosecution's written statement to the trial court that none of the information or evidence collected in the Mendez-Venegas investigation was presented to the Nuestra Familia grand jury. The prosecutor later argued that Officer Tran's testimony was only presented to the grand jury for the limited purpose of tending to corroborate the opinion that defendant was a member of the Nuestra Familia conspiracy.

[6] This court recently affirmed Guzman's conviction from that trial in case No. H039532. We will take judicial notice of the fact that Officer Tran testified for the prosecution in that trial, a transcript of which was included in the record on appeal. (Evid. Code, §§ 452, subd. (d), 459.)

24

left out certain facts in their reports so as not to "jeopardize any ongoing investigations or the safety of those involved." For example, a report authored by Sergeant Livingston soon after defendant's arrest stated, "Jack Ochoa was previously left off prior lists due to an ongoing investigation by the San Jose BNE office and San Jose PD." Similarly, Guzman's name and identifying information appear without explanation in a list at the end of a November 2007 report by a BNE agent detailing investigators' surveillance of Mendez and Venegas. The body of the report makes no mention of Guzman or why he was included in the report.

In its denial of defendant's motion below, the trial court relied largely on the form of the allegations set forth in the charging documents. The court noted that the Mendez-Venegas prosecution included no gang-related charges, whereas the Nuestra Familia indictment was focused on the gang. The court also found that the two prosecutions involved different coconspirators. But a *Kellett* analysis does not depend on the form of the pleadings, particularly where the underlying prosecutions concern a widespread conspiracy involving many coconspirators operating over an extended period of time. In such cases, it is always possible for prosecutors to divide up multiple coconspirators and charge them separately, alleging different overt acts and time periods in multiple distinct complaints. But the decision to charge two sets of coconspirators separately does not change the fact that the underlying conduct constitutes a single conspiracy. While the law of joinder generally does not require prosecutors to charge all coconspirators in a single complaint, the inclusion of the same coconspirator in two prosecutions implicates *Kellett* if the defendant's course of conduct is a significant part of both. Although the Nuestra Familia indictment included gang-related allegations not included in the Mendez-Venegas case, the record holds no evidence that defendant's relationship with Nuestra Familia involved anything other than supplying the gang with the methamphetamine he obtained from Mendez and Venegas. Thus, the defendant's course of conduct was the same in both prosecutions.

25

The trial court's finding also relied largely on its finding that defendant's intent and objectives were distinct in each case. The court found that defendant's intent in the Mendez-Venegas conspiracy was to earn a monetary profit, whereas his participation in the Nuestra Familia conspiracy was intended to benefit the gang. The Attorney General puts forth the same argument here. But as a factual matter, the record holds no substantial evidence that defendant lacked a profit motive for supplying methamphetamine to Nuestra Familia, and common sense dictates otherwise. But even assuming defendant harbored such separate objectives, the *Kellett* analysis hinges primarily on the defendant's *conduct*, not his intent or objectives. (*Kellett*, *supra*, 63 Cal.2d at p. 827 [the actor's intent or objective may be immaterial when successive prosecutions are attempted]; *Valli*, *supra*, 187 Cal.App.4th at p. 797 [intent or objective may be irrelevant under the multiple prosecution bar of Section 654].)

The Attorney General argues that *Kellett* does not bar multiple prosecutions where the defendant harbored separate objectives or objectives that are too "broad and amorphous." In support of this proposition, she cites *People v. Latimer* (1993) 5 Cal.4th 1203, and *People v. Perez* (1979) 23 Cal.3d 545. But neither case applied the *Kellett* rule against multiple *prosecutions*; they concerned the bar against multiple *punishments* under Section 654. These are two distinct aspects of Section 654. (*Neal*, *supra*, 55 Cal.2d at p. 21 [double prosecution may be precluded even when double punishment is permissible].)

For all these reasons, we conclude defendant's course of conduct formed a significant part of the offenses charged in both prosecutions.

2. *The Prosecution Was Aware of Defendant's Involvement with Nuestra Familia at the Time of the Mendez-Venegas Prosecution*

The *Kellett* bar against multiple prosecutions only applies where "the prosecution is or should be aware" that the same course of conduct plays a significant part in more than one offense. (*Kellett*, *supra*, 63 Cal.2d at p. 827, fn. omitted; *Valli*, *supra*,

26

187 Cal.App.4th at p. 796.)  Generally, courts examine what the prosecution knew or should have known before the date of the defendant's conviction in the earlier prosecution.  (See *Barriga v. Superior Court* (2012) 206 Cal.App.4th 739, 748 [prosecution should have discovered incriminating text messages before they charged defendant and entered into a plea agreement with him]; *People v. Witcraft* (2011) 201 Cal.App.4th 659, 674-675 [prosecutor should have discovered evidence of additional offense before defendant pleaded no contest].)  Here, the record shows the prosecution was aware defendant was supplying methamphetamine to Nuestra Familia well before he was arrested and charged in the Mendez-Venegas prosecution.[7]

As set forth above, police learned of defendant's role in the Mendez-Venegas distribution network as early as August 2007, when investigators seized 17 pounds of methamphetamine from a residence in San José.  At that time, investigators believed defendant was a member of Nuestra Familia.  Around the same time, investigators in the Nuestra Familia prosecution gathered a great deal of evidence regarding defendant's connection to the gang from Corrales, whose jailhouse phone calls with Guzman were recorded.  Corrales began cooperating with the police in December 2007, and police arranged recorded phone calls between Corrales and defendant in January and February 2008.  In those calls, defendant discussed his past and current interactions with Guzman, making it clear he had previously provided methamphetamine to Nuestra Familia, and reaffirming his intention to continue doing so as the opportunities arose.

Investigators gathered additional evidence of defendant's role in supplying methamphetamine to Nuestra Familia from former members of the gang.  As set forth above, former regiment commander Mendoza, who began cooperating with police in

[7] The record does not disclose the date on which the prosecution first charged defendant in the Mendez-Venegas case.  He was arrested on May 13, 2008, and the prosecution signed a second amended complaint on July 24, 2008.  Presumably, the prosecution filed the initial complaint in the intervening period.

October 2007, supplied police with a handwritten document identifying defendant, Mendez, and Venegas as drug suppliers to the gang. The document was included in a police report by Sergeant Livingston dated June 11, 2008. The same police report documented statements by former Nuestra Familia member Martinez, who told police defendant was providing up to 20 pounds of methamphetamine each month to Guzman's street regiment.

In its augmentation to the record, the prosecution filed a sworn declaration by Sergeant Lewis dated October 24, 2014. The declaration stated that Sergeant Lewis had not found "any competent evidence" in the course of his investigation identifying Mendez, Venegas, and the other Mendez-Venegas codefendants as participants in the Nuestra Familia conspiracy. The declaration further stated that Sergeant Lewis had not found any competent evidence that Mendez and Venegas provided the methamphetamine that was supplied to Guzman and Nuestra Familia. While the declaration does not state what Sergeant Lewis considered to be "competent evidence," these statements are difficult to square with the evidence noted above, including Campa's sworn declaration that the methamphetamine defendant provided to Nuestra Familia came from Mendez, who was defendant's *sole supplier*. But even assuming Sergeant Lewis' declaration is accurate, the question under *Kellett* is what the prosecution knew about defendant's participation in the Nuestra Familia conspiracy at the time of the Mendez-Venegas prosecution. Sergeant's Lewis declaration does not address this issue.

In its opposition to defendant's motion, the prosecution emphasized that the two prosecutions were "investigated by different agencies and were completely separate and distinct investigations." But the San José Police Department was involved in both investigations, and the Santa Clara County District Attorney filed both charging documents. It is irrelevant that the prosecutions were brought by different prosecutors, particularly given the seriousness of the charges. (*In re Dennis B.*, *supra*, 18 Cal.3d at p. 694 [when both offenses are serious crimes, Section 654 imposes on prosecutors an

administrative duty to ensure that the charges are joined]; *Barriga v. Superior Court*, *supra*, 206 Cal.App.4th at p. 749 [two assistant prosecutors representing the same district attorney are treated as representing the same office under *Kellett*].)

Furthermore, the record shows that the prosecutor in the Mendez-Venegas case was well aware of the impending Nuestra Familia indictment. Before defendant pleaded no contest in the Mendez-Venegas case, his trial counsel learned of the forthcoming Nuestra Familia indictment and asked the prosecutor whether defendant would be included in that indictment. The prosecutor declined to comment on the substance of the indictment but informed defendant's trial counsel that defendant "should plead now." Trial counsel interpreted that to mean the sentence contemplated under the pending plea agreement was sufficient to keep defendant from being indicted. Counsel so advised defendant, and defendant accepted the plea agreement. The prosecutor later argued that entering a plea in the Mendez-Venegas prosecution benefitted defendant because the sentencing court would not have granted his *Romero* motion if the court had been made aware of defendant's involvement with Nuestra Familia. But this ignores the fact that the probation report in the Mendez-Venegas prosecution informed the court that defendant was the connection between Nuestra Familia and the Mendez-Venegas ring. In any event, regardless of the prosecutor's motivations, the record shows the prosecutor was aware of the Nuestra Familia prosecution before defendant entered his plea in the Mendez-Venegas prosecution.

We conclude after a careful review of the evidence that the prosecution was aware of defendant's conduct in supplying methamphetamine to Nuestra Familia at the time of the Mendez-Venegas prosecution. Because defendant's course of conduct formed a significant part of the offenses in both prosecutions, the latter prosecution was barred under Section 654 and *Kellett*. Accordingly, we will reverse the judgment. In light of our reversal, we need not reach defendant's claim of double jeopardy.

29

### III. DISPOSITION

The judgment of conviction is reversed.

_____
   Márquez, J.


WE CONCUR:




_____
 Rushing, P.J.




_____
 Grover, J.




People v. Ochoa
No. H041918

Trial Court:                                    Santa Clara County
                                                Superior Court No.:  211398

Trial Judge:                                    The Honorable Jacqueline Arroyo


Attorney for Defendant and Appellant            J. Frank McCabe
Jack Jerry Ochoa:                               under appointment by the Court of
                                                Appeal for Appellant




Attorneys for Plaintiff and Respondent          Kamala D. Harris,
The People:                                      Attorney General

                                                Gerald A Engler,
                                                Chief Assistant Attorney General

                                                Jeffrey M. Laurence,
                                                Senior Assistant Attorney General

                                                Rene A. Chacon,
                                                Supervising Deputy Attorney General

                                                Juliet B. Haley,
                                                Deputy Attorney General




People v. Ochoa
H041918