Filed 12/10/20  P. v. Avalos CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EMANUEL AVALOS et al.,<br><br>  Defendants and Appellants. | F076301<br><br>(Super. Ct. No. VCF325028B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Emanuel Avalos.

Jennifer A. Mannix, under appointment by the Court of Appeal, for Defendant and Appellant Cervando Avalos, Jr.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Brook A. Benningson and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

This prosecution was the culmination of a multi-agency law enforcement operation. It occurred in 2015 and focused on the Norteño criminal street gang in Tulare County. It involved wiretaps of about 34 telephones, and live surveillance of suspects. Law enforcement was able to determine the hierarchy of the Norteño gang in and around Tulare County.

The criminal complaint charged approximately 80 individuals with gang-related crimes. Appellants Cervando Avalos, Jr. and Emanuel Avalos were part of the original charges and they were tried together but bifurcated from the other defendants.[1] The jury found Cervando guilty of 14 felonies and it found true numerous enhancements. He received an aggregate determinate sentence of eight years eight months, along with a consecutive aggregate indeterminate sentence of 17 years to life.

Emanuel was convicted of 16 felonies and the jury found true numerous enhancements. He received an aggregate determinate sentence of 10 years eight months, along with a consecutive aggregate indeterminate sentence of 100 years to life.

Although we reject most of appellants' arguments on appeal, some of their claims have merit. Cervando's conspiracy conviction in count 101 must be reversed for insufficient evidence. In addition, Cervando's firearm enhancements found true under Penal Code section 12022.4, subdivision (a), in counts 19 and 163 must be reversed for insufficient evidence.[2] We vacate Cervando's sentence and we remand his matter for

---

[1]    Because they share the same last name, we will refer to Cervando and Emanuel by their first names. Collectively we will refer to them as appellants. We list later in this opinion each of appellants' respective charges, convictions and sentences. Because of the number of defendants and charges in the original complaint, appellants' counts were not in sequential number when they went to trial.

[2]    All future statutory references are to the Penal Code unless otherwise noted. To assist the parties at resentencing, we note that Cervando does not challenge the sufficiency of the evidence regarding the other firearm enhancements (§ 12022, subd. (a)(1)) found true in counts 19 and 163.

resentencing. In addition, a clerical error exists in Cervando's determinate abstract of judgment, which we direct the court to correct. We remand for resentencing but otherwise affirm Cervando's judgment.

For Emanuel, the trial court imposed improper sentences in counts 18, 20, 35, 69, 72 and 73 when it ordered these sentences to run concurrently but also stayed them. In addition, the court failed to articulate reasons in support of the upper-term sentence enhancements it imposed in counts 19 and 29. We will vacate Emanuel's sentence and remand his matter for resentencing. When resentencing Emanuel, the court shall exercise its discretion under Senate Bill No. 620 for the firearm enhancement (§ 12022.53, subds. (c) & (e)(1)) found true in count 73. Further, clerical errors appear in Emanuel's determinate and indeterminate abstracts of judgment, which we direct the court to correct. We remand for resentencing but otherwise affirm Emanuel's judgment.

## BACKGROUND

### I.    Appellants' Respective Convictions And Sentences.

We summarize appellants' respective charges, convictions and sentences.[3]

#### A.    Cervando's convictions and sentences.

Cervando received an aggregate determinate sentence of eight years eight months. A consecutive indeterminate sentence of 17 years to life was imposed. The following is a breakdown of his convictions and sentences.

| Count | Section(s) | Offense and enhancement(s) (if any) | Verdict and finding(s) (if any) | Sentence(s) |
|---|---|---|---|---|
| 19 | 182(a)(1); 212.5(a); 213(a)(1)(A) | Conspiracy to commit home invasion robbery in concert | Guilty | Consecutive 15 years to life with possibility of parole |

---

[3]    To conserve space, we omit "subdivision" in the citations for the various statutes. The applicable subdivisions, however, are denoted for each statute by the respective parentheses.

| | | | | |
|---|---|---|---|---|
| | 186.22(b) | Gang enhancement | True | No time imposed[4] |
| | 12022.4(a) | Firearm enhancement | True | Consecutive two years |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |
| 20 | 182.5; 212.5(a); 213(a)(1)(A) | Gang conspiracy to commit home invasion robbery in concert | Guilty | One-third consecutive midterm; stayed |
| 84 | 182(a)(1); 487(a) | Conspiracy to commit grand theft | Guilty | Middle term of two years |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive three years |
| | 12022.4(a) | Firearm enhancement | True | Consecutive two years |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |
| 85 | 664; 487(a) | Attempted grand theft of marijuana | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year; stayed |
| | 12022.4(a) | Firearm enhancement | True | Consecutive eight months; stayed |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |
| 89 | 186.22(a) | Street terrorism (on or about and between September 19–20, 2015) | Guilty | One-third consecutive midterm; stayed |

---

**4** Cervando's indeterminate term in count 19 was triggered because of section 186.22, subdivision (b)(4)(B), i.e., home invasion robbery with the gang enhancement.

| | | | | |
|---|---|---|---|---|
| 91 | 182(a)(1); 487(a) | Conspiracy to commit grand theft | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year; stayed |
| 92 | 487(a) | Grand theft (marijuana) | Guilty | One-third consecutive midterm of eight months |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year |
| 93 | 186.22(a) | Street terrorism (on or about September 22, 2015) | Guilty | One-third consecutive midterm; stayed |
| 101 | 182(a)(1); Health and Safety Code section 11351 | Conspiracy to possess for sale a controlled substance (cocaine) | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year; stayed |
| 102 | Health and Safety Code section 11351 | Possession for sale of controlled substance (cocaine) | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year; stayed |
| 103 | 182(a)(1); Health and Safety Code section 11352(a) | Conspiracy to sell or transport a controlled substance for sale (cocaine) | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year; stayed |
| 104 | Health and Safety Code section 11352(a) | Sale or transportation for sale of a controlled | Guilty | One-third consecutive midterm |

| Count | Section(s) | Offense and enhancement(s) | Verdict and finding(s) | Sentence(s) |
|---|---|---|---|---|
| | | substance (cocaine) | | |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive one year |
| 105 | 182.5; Health and Safety Code section 11352(a) | Gang conspiracy to possess a controlled substance (cocaine) for sale and transportation for sale | Guilty | One-third consecutive midterm; stayed |
| 163 | 664(a); 212.5(a); 213(a)(1)(A) | Attempted home invasion robbery in concert | Guilty | Three years; stayed |
| | 186.22(b)(1)(B) | Gang enhancement | True | Consecutive five years; stayed |
| | 12022.4(a) | Firearm enhancement | True | Consecutive two years; stayed |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |

## B.    Emanuel's convictions and sentences.

Emanuel received an aggregate determinate sentence of 10 years eight months. A consecutive aggregate indeterminate sentence of 100 years to life was imposed. The following is a breakdown of his convictions and sentences.

| Count | Section(s) | Offense and enhancement(s) (if any) | Verdict and finding(s) (if any) | Sentence(s) |
|---|---|---|---|---|
| 17 | 182(a)(1); 187(a) | Conspiracy to commit murder | Guilty | Consecutive 25 years to life with possibility of parole |
| | 186.22(b)(5) | Gang enhancement | True | 15-year minimum parole eligibility |

| 18 | 182.5;<br>187(a) | Gang conspiracy to commit murder | Guilty | 25 years to life with possibility of parole; stayed |
|---|---|---|---|---|
| 19 | 182(a)(1);<br>212.5(a);<br>213(a)(1)(A) | Conspiracy to commit home invasion robbery in concert | Guilty | Consecutive 15 years to life with possibility of parole |
| | 186.22(b) | Gang enhancement | True | No time imposed[5] |
| | 12022.4(a) | Firearm enhancement | True | Consecutive three years |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |
| 20 | 182.5;<br>212.5(a);<br>213(a)(1)(A) | Gang conspiracy to commit home invasion robbery in concert | Guilty | Consecutive 15 years to life; stayed |
| 29 | 182(a)(1);<br>496d(a) | Conspiracy to purchase or receive a stolen vehicle | Guilty | Middle term of two years |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive four years |
| 30 | Vehicle Code section 10851(a) | Unlawful driving or taking a vehicle | Not guilty | |
| | 186.22(b) | Gang enhancement | Not true | |
| 35 | 182.5;<br>496d(a) | Gang conspiracy to purchase or receive a stolen vehicle | Guilty | One-third consecutive midterm; stayed |
| | 186.22(b) | Gang enhancement | True | No time imposed |
| 43 | 182(a)(1);<br>520 | Conspiracy to commit extortion | Guilty | Consecutive seven years to life |
| | 186.22(b) | Gang enhancement | True | |

---

**5** Emanuel's indeterminate term was triggered because of section 186.22, subdivision (b)(4)(B), i.e., home invasion robbery with the gang enhancement.

| | | | | No time imposed[6] |
|---|---|---|---|---|
| 65 | 182(a)(1); 187(a) | Conspiracy to commit murder | Guilty | Consecutive 25 years to life with possibility of parole |
| | 186.22(b)(5) | Gang enhancement | True | 15-year minimum parole eligibility |
| 67 | 182(a)(1); 496d(a) | Conspiracy to purchase or receive a stolen vehicle | Guilty | One-third consecutive midterm of eight months |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive 16 months |
| 68 | Vehicle Code section 10851(a) | Unlawful driving or taking a vehicle | Not guilty | |
| | 186.22(b) | Gang enhancement | Not true | |
| 69 | 182.5; 187(a) | Gang conspiracy to commit murder | Guilty | Consecutive 25 years to life; stayed |
| 71 | 182(a)(1) 187(a) | Conspiracy to commit murder | Guilty | Consecutive 25 years to life |
| | 186.22(b)(5) | Gang enhancement | True | 15-years minimum parole eligibility |
| 72 | 182.5; 187(a) | Gang conspiracy to commit murder | Guilty | Consecutive 25 years to life; stayed |
| 73 | 664(a); 187(a) | Attempted murder | Guilty | Consecutive 25 years to life; stayed |
| | 664(a) | Premeditation and deliberation | True | |

---

**6** Emanuel's indeterminate sentence of seven years to life was triggered under section 186.22, subdivision (b)(4)(C), because of extortion along with the gang enhancement.

| | 186.22(b)(1)(A) | Gang enhancement | True | No time imposed |
| | 12022.53(c) & (e)(1) | Firearm enhancement | True | Consecutive 20 years; stayed |
| 126 | Health and Safety Code section 11378 | Possession for sale of controlled substance (methamphetamine) | Guilty | One-third consecutive midterm of eight months |
| | 186.22(b)(1)(A) | Gang enhancement | True | Consecutive 16 months |
| 127 | 30605(a) | Possession of assault weapon | Guilty | One-third consecutive midterm of eight months |
| | 186.22(b) | Gang enhancement | Not true | |
| 163 | 664(a); 212.5(a); 213(a)(1)(A) | Attempted home invasion robbery in concert | Guilty | Three years six months; stayed |
| | 186.22(b)(1)(B) | Gang enhancement | True | Consecutive five years; stayed |
| | 12022.4(a) | Firearm enhancement | True | Consecutive three years; stayed |
| | 12022(a)(1) | Firearm enhancement | True | No time imposed |

## II. Appellants Are Norteño Gang Members Who Exercised Control Over Other Gang Members.

The prosecution established that appellants (individually and collectively) were involved in criminal incidents from August 15, 2015, through and including September 28, 2015. Appellants do not dispute a majority of their convictions, or the jury's true findings. We summarize the material facts relevant to the issues raised on appeal, and we provide additional facts later in this opinion.

In 2015, Pedro "Pistol Pete" Sanchez was the acting "regimental commander" of Tulare County for the Norteño street gang. Sanchez would send out orders which were filtered down to various subordinates. The Nuestra Familia, a prison gang, runs the

Norteño street gang.  Sanchez worked directly under a ranking Nuestra Familia member.  The gang divided Tulare County into three sections: north, central and south.  Each section had a Norteño gang leader who reported to Sanchez.  Each city generally had a Norteño "commander" who was in charge.

Appellants are brothers.  The prosecution established that appellants are Norteño gang members.  When law enforcement began its investigation, Emanuel ran the south section of Tulare County for the Norteño gang.  On or about September 13, 2015, however, Cervando took over that position from Emanuel.  Appellants received orders from Sanchez to commit crimes, and they gave orders to other gang members to commit crimes.[7]  As south county leaders, appellants were responsible for all of the Norteño gang activity within their area.  During this investigation, law enforcement intercepted almost daily communications showing appellants' involvement in narcotic sales, assaults, violent crimes and auto theft.

At trial, appellants repeatedly claimed that they were never gang members.  Instead, they asserted that they had only associated with Norteño gang members.

Emanuel disputed that he had any authority or power in the gang.  He stated that he was forced to work as Sanchez's messenger.  He claimed that he made drug deliveries and collected money for Sanchez.[8]  He testified that Sanchez made him take possession of a gang cell phone that was used to conduct gang business.  According to Emanuel, whenever he acted, he was simply following Sanchez's orders, passing on Sanchez's

---

[7]     On cross-examination, the prosecution's gang expert admitted that he could not state that all orders came from Sanchez, but he believed Sanchez knew about all of the orders that appellants gave to other gang members because they were "reported back up" to Sanchez.

[8]     During this investigation, appellants lived together.  At one point, Sanchez moved into appellants' residence.  Because Sanchez was with appellants, he may not have communicated all orders through the telephone.  According to Emanuel, Sanchez moved in against appellants' will but they felt that they could not refuse him.  Cervando testified that Sanchez "made his way into our home" and he "was living there" not by their choice.

wishes, and he feared being murdered if he refused to do what Sanchez wanted. Emanuel claimed that he was afraid of Sanchez because he knew Sanchez had caused people to be killed.[9] Emanuel believed he would be killed if he refused to act for Sanchez. He also feared for his family, including his two minor sons.[10]

Cervando testified that he took control of the gang's cell phone from Emanuel because he knew Emanuel was in trouble. According to Cervando, Sanchez was upset with Emanuel's performance. Cervando said he had wanted to protect Emanuel.[11] Cervando denied that he was a high-ranking Norteño gang member or that he had any authority. He denied being able to issue fines on other gang members. Cervando claimed that he feared Sanchez, and Cervando also feared for the safety of his minor daughter. He knew that Sanchez had caused people to be killed. In addition, Cervando told the jury that he had provided information to law enforcement regarding a particular murder that Sanchez had caused, and Cervando was in fear that Sanchez might learn that he had done so. Cervando felt like he could not say "no" when Sanchez told him to do things. He testified that Sanchez could have had him killed. Cervando generally denied

---

[9]     At trial, the prosecution's gang expert explained that Sanchez was believed to have ordered three murders in Tulare County, but witnesses were afraid to come forward. This wiretap operation was started in an effort to obtain more evidence against Sanchez.

[10]     To resolve a vandalism charge (§ 594, subd. (a)) when he was 18 years old, Emanuel volunteered for service in the United States Army. His service began in August 2008. In 2010 he was deployed to Iraq for one year. He told the jury that he felt extreme stress during his time in Iraq, and he came under fire. He was discharged from active duty in January 2012. Emanuel claimed that, after his combat time in Iraq, he felt "very anxious, very stressed out." He thought someone was "after" him and he could not do anything about it.

[11]     During closing argument, the prosecutor noted that Cervando was in charge only for about two weeks before law enforcement concluded its investigation on October 1, 2015, and arrested appellants. According to the prosecutor, Emanuel had to step down as the south county gang leader because all of his operations were a failure.

11.

having any criminal intent to commit the charged crimes. Instead, he was just keeping Sanchez aware of events and/or following Sanchez's instructions and orders.[12]

## DISCUSSION

**I.    Cervando's Conspiracy Conviction In Count 101 Must Be Reversed For Insufficient Evidence; However, His Conspiracy Convictions In Counts 19, 20, 103 And 105 Are Proper.**

In count 19, Cervando was convicted of conspiracy to commit a home invasion robbery (§ 182, subd. (a)(1)). In count 20, he was convicted of gang conspiracy (§ 182.5) to commit the same home invasion robbery.

In count 101, Cervando was convicted of conspiracy to possess cocaine for sale (§ 182, subd. (a)(1)). In count 103, he was convicted of conspiracy to sell or transport the same cocaine for sale (§ 182, subd. (a)(1)). Finally, in count 105, he was convicted of gang conspiracy (§ 182.5) to sell or transport that same cocaine for sale.

Cervando contends that his conviction for gang conspiracy in count 20 must be reversed because it was not a separate crime from his conviction for traditional conspiracy in count 19 for the same home invasion robbery. Similarly, he argues that his traditional conspiracy conviction in count 101 and his gang conspiracy in count 105 must be reversed because they were part of the same crime for his conviction for traditional conspiracy in count 103 to possess cocaine for sale, and to sell that cocaine and/or transport it for sale.[13]

---

[12]    With CALCRIM No. 3402, the jurors were instructed, in part, that appellants were "not guilty of all crimes charged if they acted under duress." Appellants were represented by the same defense counsel at trial. During closing argument, their counsel asserted, in part, that appellants had acted under duress when all of the charges occurred. According to counsel, appellants were reasonably in fear of Sanchez, and their counsel asked the jury to find appellants not guilty of all charges.

[13]    As part of his series of arguments regarding these conspiracy convictions, Cervando alternatively claims that, even if more than one conspiracy existed, the trial court abused its discretion in failing to instruct the jury to decide whether a single conspiracy or multiple conspiracies existed. If the court had no sua sponte duty to

12.

Cervando's arguments are based primarily on the rule that, when a group of conspirators agree to commit a number of different crimes incidental to a single criminal objective, only one conspiracy exists and convictions for multiple conspiracies cannot be sustained. (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1133 (*Liu*).) In such a situation, the issue is whether there was one overall agreement to perform various functions to achieve the conspiracy's objectives. (*People v. Vargas* (2001) 91 Cal.App.4th 506, 553–554.)

We summarize the material trial evidence supporting these convictions.

## A. Background facts.

### 1. Cervando's convictions in counts 19 and 20.

Cervando acknowledges that facts support his convictions in counts 19 and 20. He concedes that he entered into an agreement with other gang members to commit a residential robbery, and some of them committed acts in furtherance of that agreement. His arguments, however, pertain to an alleged improper overlapping of convictions for the same conduct. Because Cervando concedes the underlying facts supporting these convictions, we provide only a brief summary of the evidence.

From August 24 through August 25, 2015, law enforcement intercepted communications involving Sanchez, appellants, and other Norteño gang members. Under Sanchez's orders, Norteño gang members were assembled and equipped to rob two residences in Visalia.[14]

instruct in this regard, Cervando maintains that his defense counsel was ineffective in failing to seek such an instruction. Emanuel raises a similar challenge to some of his conspiracy convictions. We address the alleged instructional error in section III, below.

[14] Sanchez informed a gang member that an "[o]ld lady" lived in one residence, and a husband and wife were in the other. According to Sanchez, these people had "safes and guns and gold." Sanchez said the robberies would be "easy." Emanuel told a gang member that Sanchez wanted the residents "tied up" during the robberies.

On August 25, 2015, numerous gang members left in two vehicles. Appellants were in the second vehicle, which was following the first vehicle closely in an apparent attempt to block law enforcement from coming behind it. Law enforcement determined that the gang members were initiating the planned robberies, and they maneuvered behind the first vehicle and ahead of appellants' vehicle in order to initiate a traffic stop. The first vehicle led law enforcement on a high-speed chase before the vehicle struck a median and apparently became disabled. The five occupants, all Norteño gang members, fled on foot, but law enforcement was able to eventually capture all of them. Five loaded firearms, masks, and gloves were recovered.

At trial, the prosecution's expert was presented with a hypothetical mirroring the facts of these planned robberies. The expert opined that this operation was done with the intent to benefit the Norteño criminal street gang.

### 2. Cervando's convictions in counts 101, 103, and 105.

Similar to the convictions above, Cervando concedes that he was involved in a conspiracy to possess cocaine for sale, and to transport that cocaine for sale.[15] As such, we only provide a general overview of the material trial evidence supporting the convictions in counts 101, 103 and 105.

On September 28, 2015, Cervando provided cocaine to Miguel Reyes, who is a Norteño gang member and drug dealer. That same day, Reyes arranged to sell the cocaine to certain unidentified suspects. After Reyes met with Cervando, law enforcement conducted a traffic stop and detained Reyes. Reyes was in possession of over 18 grams of cocaine.[16]

---

[15] During closing argument, Cervando's counsel conceded to the jury that Cervando was guilty in counts 101, 103, and 105.

[16] At trial the parties stipulated that Reyes had possessed cocaine.

14.

At trial, the prosecution's gang and drug expert was presented with a hypothetical that mirrored the facts surrounding Cervando meeting with Reyes, Reyes communicating with potential buyers, and Reyes being stopped a short time later with cocaine in his possession. The expert opined that the amount of drugs recovered would be for sales, and the drugs were intended to be sold to benefit the gang.

At trial, Cervando admitted that he had received cocaine from Sanchez. According to Cervando, Sanchez had directed him to give the cocaine to Reyes, and Cervando did so. Cervando denied that he ever had an agreement with Reyes that the two of them would possess cocaine for sale. He denied ever having an agreement with Reyes that the two of them would sell or transport cocaine. Finally, he denied having a specific intent to promote, further or assist a gang member when he gave the cocaine to Reyes. Instead, he claimed that he was simply following Sanchez's orders.

## B.    Standard of review.

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the record in the light most favorable to the judgment and decide whether it contains substantial evidence from which a reasonable finder of fact could make the necessary finding beyond a reasonable doubt. The evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

## C.    Analysis.

Cervando argues that only a single conspiracy existed as a matter of law for the planned home invasion robberies on August 24–25, 2015. He likewise contends only a single conspiracy existed as a matter of law for the cocaine that he possessed (and which

15.

Reyes transported) on September 28, 2015. He claims alternatively that multiple prosecutions for the same offense violated principles of double jeopardy.[17]

As we explain below in greater detail, we reject Cervando's first argument related to the home invasion robberies. The convictions in count 19 (traditional conspiracy) and count 20 (gang conspiracy) were based on different criminal agreements, and sufficient evidence supports them. Nevertheless, Cervando's second argument regarding the cocaine has merit. The conviction in count 101 (traditional conspiracy to possess cocaine for sale) must be reversed because that conspiracy agreement was part of the same conspiracy agreement in count 103 (conspiracy to sell or transport cocaine for sale). However, sufficient evidence otherwise supports the convictions in counts 103 and 105 (gang conspiracy). We summarize the distinctions between traditional conspiracy and gang conspiracy before addressing Cervando's arguments.

### 1. The traditional form of conspiracy (§ 182).

Under section 182, subdivision (a)(1), a conspiracy exists when two or more persons conspire to commit any crime. (*People v. Morante* (1999) 20 Cal.4th 403, 416.) The prosecution must establish that the defendant and another person had the specific intent to agree to commit an offense, as well as the specific intent to commit the elements of that offense. In addition, one or more of the conspirators must commit an overt act in furtherance of the conspiracy. (*Ibid.*)

"The crime of conspiracy can be committed whether the conspirators fully comprehended its scope, whether they acted together or in separate groups, or whether they used the same or different means known or unknown to them." (*People v. Cooks*

---

**17** "The double jeopardy clauses of the Fifth Amendment to the United States Constitution and article I, section 15, of the California Constitution provide that a person may not be twice placed 'in jeopardy' for the 'same offense.' 'The double jeopardy bar protects against a second prosecution for the same offense following an acquittal or conviction, and also protects against multiple punishment for the same offense. [Citations.]' [Citation.]" (*People v. Anderson* (2009) 47 Cal.4th 92, 103–104.)

16.

(1983) 141 Cal.App.3d 224, 312.) "A single conspiracy may exist even if some conspirators are unaware of the identity or existence of other coconspirators." (*People v. Ochoa* (2016) 248 Cal.App.4th 15, 30.)

### 2.     Gang conspiracy (§ 182.5).

Under section 182.5, any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, assists, or benefits from any felonious criminal conduct by members of that gang, is guilty of conspiracy to commit that felony.  Our Supreme Court makes it clear that traditional conspiracy under section 182 and gang conspiracy under section 182.5 cover different kinds of conduct.[18] (*People v. Johnson* (2013) 57 Cal.4th 250, 263 (*Johnson*).)

Our Supreme Court states that, once gang defendants agree to commit a specific crime, for example, shooting a rival in retaliation, the agreement constitutes a conspiracy to commit murder and assault.  (*Johnson*, *supra*, 57 Cal.4th at p. 267.)  However, such an agreement could also constitute gang conspiracy.  "Thus, just as a single agreement to kill someone with a firearm would encompass a conspiracy to commit both murder and assault with a firearm, a single agreement among active gang participants to commit a shooting with other gang members would additionally encompass a conspiracy to commit the gang participation offense.  The conspiracy was completed once one of them committed an overt act toward the shooting." (*Ibid.*)

### 3.     Reversal is not warranted for the conviction in count 20.

Cervando raises numerous arguments in support of his assertion that his conviction in count 20 (gang conspiracy associated with the home invasion robbery) should be reversed.  He contends that the charges in counts 19 and 20 overlapped for

---

[18]     Section 182.5 was enacted by voter initiative (Proposition 21) in 2000.  (*People v. Lopez* (2020) 46 Cal.App.5th 505, 520, review granted July 15, 2020, S261747.)

several reasons:  (1) the jury was instructed, in part, to use the same 10 overt acts to find him guilty;[19] (2) these counts involved the same group of people; and (3) these charges occurred on the same day.  According to Cervando, these crimes were based on the same motive to commit "a residential robbery with the intent to support and benefit the gang at the order of a higher ranking gang member."  He asserts that "charging conspiracy in two separate counts does not create two separate conspiracies from a single, general, and overriding agreement to commit a residential robbery."  He also argues that "whether a single conspiracy or multiple conspiracies exist cannot be decided based on the target crimes committed in pursuit of the underlying charged conspiracies."

We reject Cervando's various arguments regarding the conspiracy convictions stemming from the planned home invasion robberies.  He is incorrect that his convictions in counts 19 and 20 involved the same crime or that double jeopardy was violated.

Cervando fails to discuss *Johnson*.  He never addresses how our Supreme Court holds that traditional conspiracy and gang conspiracy involve "different kinds of conduct."  (*Johnson*, *supra*, 57 Cal.4th at p. 263.)  He never acknowledges that a prosecutor may charge both traditional conspiracy under section 182 and a gang conspiracy under section 182.5.  (See *Johnson*, *supra*, at p. 267.)

Moreover, Cervando relies upon four opinions which were issued prior to the creation of section 182.5.[20]  Cervando's cited opinions had no occasion to analyze the

---

[19]     For count 19, the jury was instructed with CALCRIM No. 415 regarding the elements necessary to establish a traditional conspiracy.  Those instructions involved 10 alleged overt acts.  For count 20, the jury was instructed with CALCRIM No. 1400 and provided with the elements necessary to find active participation in a gang.  For count 20, the jury was also directed to refer back to CALCRIM No. 415 for the general conspiracy requirements.  As such, Cervando asserts that the overt acts necessary to establish the charged conspiracies in counts 19 and 20 "overlapped."

[20]     Cervando generally relied upon (1) *Braverman v. United States* (1942) 317 U.S. 49; (2) *People v. Lopez* (1994) 21 Cal.App.4th 1551 (*Lopez*); (3) *People v. Patrick* (1981) 126 Cal.App.3d 952; and (4) *In re Application of Nichols* (1927) 82 Cal.App. 73.

distinctions between traditional conspiracy and gang conspiracy. Cases are not authority for propositions not considered or decided. (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.)

Further, Cervando contends that the prosecutor's closing argument established a "theory of the case" for only one conspiracy. We disagree with Cervando's interpretation of the record.

The prosecutor never informed the jury, or even implied, that the charge alleged in count 20 was duplicative of the charge in count 19. To the contrary, without specifically mentioning the counts, the prosecutor went through the facts establishing that the gang planned these home invasion robberies. The prosecutor recounted all of the preparation that was involved, and how law enforcement was able to stop the planned robberies after the gang members began driving towards the intended targets. The jury was instructed on the different elements required for the convictions in these counts. The verdict forms for these counts followed the charges alleged in the first amended information, and these charges represented different crimes based on the alleged violation of different statutes. Thus, we reject Cervando's claims that the trial evidence and the prosecution's argument demonstrated a single crime.

Finally, substantial evidence supports Cervando's convictions in counts 19 and 20. The prosecution established that, for count 19, Cervando and at least one other individual had the specific intent to agree or conspire to commit a home invasion robbery, as well as the specific intent to commit the elements of that offense. In addition, at least one member of the agreement committed an overt act in furtherance of that agreement.

For count 20, the prosecution proved that Cervando actively participated in a criminal street gang. When Cervando did so, he knew that members of the gang engage in or have engaged in a pattern of criminal gang activity. Cervando willfully assisted, furthered, or promoted felonious criminal conduct (the planned home invasion robberies) by members of the gang. The required elements for these convictions are different. For

19.

instance, Cervando violated section 182.5 as an active and knowing gang participant when he acted with the required intent to promote, further, or assist in the commission of a felony by other gang members. That act of assistance or promotion replaced the required prior agreement to commit a crime that is ordinarily at the heart of a traditional conspiracy. (*Johnson*, *supra*, 57 Cal.4th at p. 262.) Traditional conspiracy liability attaches once an overt act is committed. In contrast, a gang conspiracy "requires the actual commission of felonious criminal conduct as either an attempt or a completed crime." (*Ibid*.)

Based on this record, a reasonable jury could have found Cervando guilty in counts 19 and 20 beyond any reasonable doubt. The evidence in support of these convictions was reasonable, credible and of solid value. Thus, substantial evidence supports these convictions. Moreover, these crimes were based on different elements. Consequently, reversal is not warranted for one of these convictions, and this claim fails.

### 4.    Reversal is required for Cervando's conviction in count 101.

Cervando's next argument has merit. On September 28, 2015, he only entered into one traditional conspiracy to possess cocaine for sale, and to transport that same cocaine for sale.

On September 28, 2015, Sanchez provided cocaine to Cervando, who then provided it to Reyes. Reyes secured potential buyers. Reyes was in the process of transporting that cocaine when law enforcement stopped him. This evidence, along with the reasonable inferences drawn from it, overwhelmingly establish that Cervando had an agreement to both possess the cocaine for sale, and to transport that cocaine for sale.

Respondent argues that Cervando had two separate conspiracy agreements: one with Sanchez to possess the cocaine and a separate agreement with Reyes to transport that cocaine. We disagree with respondent's position because it is contrary to the prosecution's theory below.

20.

During closing argument, the prosecutor asserted that Cervando's conspiracies to sell and transport this cocaine was "simple" because Cervando spoke with Reyes regarding the drugs, and Cervando supplied drugs to Reyes to be sold to benefit the gang. The prosecutor's closing argument shows that counts 101 and 103 were based on Cervando's agreement with Reyes. Moreover, during Cervando's closing argument, his counsel conceded that Cervando gave Reyes drugs, and his counsel conceded that Cervando was guilty in counts 101, 103 and 105.

This record overwhelmingly establishes that, when Cervando took possession of the cocaine from Sanchez, Cervando was to possess it for sale, and to provide it to Reyes for transportation for sales. Thus, we agree with Cervando that the evidence only establishes one controlling conspiracy agreement under section 182, subdivision (a)(1). Consequently, his overlapping traditional conspiracy conviction cannot stand. (See *Liu, supra*, 46 Cal.App.4th at p. 1133.) Contrary to Cervando's arguments, however, his conviction in count 105 is proper because, even though it involved an agreement to possess, sell and transport the same cocaine, that conviction was based on gang conspiracy. Therefore, reversal of the conviction in count 105 is not warranted. (See *Johnson*, *supra,* 57 Cal.4th at p. 267.)

Between counts 101 and 103, the issue is which conviction must be reversed. Cervando's conviction in count 103 for conspiring to violate Health and Safety Code section 11352 provides a greater sentencing triad (three, four, or five years) than his conviction in count 101 for conspiring to violate Health and Safety Code section 11351 (two, three, or four years). Thus, it is appropriate to reverse the conviction in count 101 so that his criminal liability is commensurate with his conduct. (See *People v. Rojas* (2015) 237 Cal.App.4th 1298, 1308–1309 [when a defendant is convicted of alternative offenses, he should be left standing convicted of the alternative offenses that are most commensurate with his culpability]; *People v. Torres* (2002) 102 Cal.App.4th 1053, 1059 [same].)

21.

We reverse Cervando's conviction in count 101 for insufficient evidence. Double jeopardy bars a retrial on the same charge. (See *Lockhart v. Nelson* (1988) 488 U.S. 33, 39.) Accordingly, we vacate Cervando's sentence, and we remand his matter for resentencing.[21]

## II. Reversal Is Not Warranted For Emanuel's Conviction In Count 67.

Similar to Cervando's assertions above, Emanuel argues that his conviction in count 67 (conspiracy to receive a stolen vehicle) must be reversed. He contends that this crime was part of the conspiracies in count 65 (conspiracy to commit murder) and in count 69 (gang conspiracy to commit murder). He asserts that double jeopardy prohibits the multiple convictions.[22]

### A. Background facts for Emanuel's convictions in counts 65, 67, and 69.

On August 29 and 30, 2015, and then again on September 2 and 3, 2015, law enforcement intercepted communications between Emanuel and various Norteño gang members. Emanuel gave instructions for either a dropout or a Sureño to be shot. The gang eventually focused on a particular target. Emanuel made it clear that Sanchez wanted this done. Based on the intercepted communications, law enforcement believed the Norteños were targeting a Sureño residence.

On September 3, 2015, Emanuel spoke with Eddie Mena, a Norteño gang member. Mena asked Emanuel where he should drop off a stolen vehicle that Emanuel wanted. They agreed the drop-off would occur at a cemetery, and Emanuel would send some gang members ("homies") to pick it up. Mena asked if he was going to get the vehicle back.

---

[21] A full resentencing is appropriate when part of a sentence is stricken on review. This permits the trial court to exercise its sentencing discretion in light of the changed circumstances. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

[22] Alternatively, Emanuel maintains that the trial court abused its discretion in failing to instruct the jury to decide whether a single conspiracy or multiple conspiracies existed. Cervando raised a similar argument. We address the alleged instructional error in section III, below.

Emanuel advised, "I don't think you'll want it back after what they're going to use it for." Mena laughed and said they would "just get another one."

On September 3, 2015, law enforcement intercepted messages from gang members who discussed hitting the target. That same day, law enforcement intercepted a conversation between Emanuel and a Norteño gang member in which they discussed the targeted Sureño residence. The other gang member expressed concern that children would be at the intended target. Emanuel responded that "you can tell the difference between a kid and a grown person." He said, "You don't want to go in there and start shooting blind."

On September 3, 2015, law enforcement observed the stolen vehicle being delivered at the agreed upon cemetery. Some unidentified males were waiting at the cemetery. The stolen vehicle was driven away, and a second vehicle was also driven in tandem with the stolen vehicle. Law enforcement followed the vehicles. After driving around for a while, the gang members eventually went to a house. Later, the second vehicle drove around the area of the intended target before returning to that house. Later that day, law enforcement observed three males leave the house and drive away in the stolen vehicle. It was believed that the Norteños had commenced their plan to shoot at the Sureño residence. Law enforcement attempted to initiate a traffic stop, and a high-speed chase occurred. The three occupants abandoned the stolen vehicle and they fled on foot. Two of the three suspects, both juveniles, were apprehended, while the third suspect got away. The two juveniles were low-ranking Norteño gang members. One of them had a loaded handgun.

At trial, the prosecution's gang expert was presented with a hypothetical that mirrored these facts. The expert opined that the planned operation to shoot at the Sureño gang member was done to benefit the Norteño gang. The expert found it significant that the gang members had obtained a stolen vehicle from outside the area before starting this operation.

At trial, Emanuel admitted that he had communicated with Mena to have a stolen vehicle brought to the cemetery. He also admitted passing on orders from Sanchez for gang members to "get a squad" on the intended target. However, he asserted that he did not want this done on his behalf, and he denied ever intending to kill anyone.

**B.      Analysis.**

Emanuel argues that his conspiracy in count 67 to take possession of the stolen vehicle was incidental to the conspiracies to commit murder in counts 65 and 69. He contends that his conviction in count 67 must be reversed. His argument is based on the principle that multiple conspiracies cannot be sustained if conspirators agreed to commit a number of different crimes incidental to a single objective. (*Liu*, *supra*, 46 Cal.App.4th at p. 1133.)

We reject Emanuel's assertions and we agree with respondent that Emanuel's conviction in count 67 is supported by sufficient evidence. Five opinions support our conclusion that Emanuel's agreement with Mena was a separate conspiracy from Emanuel's agreement with other gang members to commit the planned murder.

**1.      *Kotteakos*.**

In *Kotteakos v. United States* (1946) 328 U.S. 750 (*Kotteakos*) the defendant acted as a broker and assisted individuals in filing false loan applications. (*Id.* at pp. 752–753.) Finding no connection between the borrowers, the United States Supreme Court observed that the case presented several conspiracies patterned like a wheel with separate spokes meeting at a common center (the defendant) without a rim enclosing the spokes. (*Id.* at pp. 754–755.) While the loan applications were all linked to the defendant and had a similar purpose, the defendant and the borrowers were not "in a common adventure." (*Id.* at pp. 768–769.) The court warned against confusing "the common purpose of a single enterprise with the several, though similar, purposes of numerous separate adventures of like character." (*Id.* at p. 769.)

### 2. *Lopez.*

In *Lopez*, *supra*, 21 Cal.App.4th 1551, an opinion which Emanuel cites from this court,[23] the same group of conspirators agreed to commit a number of different crimes incidental to a single objective of creating methamphetamine. (*Id.* at pp. 1553–1554.) The defendant was convicted of conspiracy to manufacture methamphetamine, conspiracy to illegally dispose of hazardous substances, and conspiracy to possess methamphetamine for sale. (*Id.* at p. 1554.) This court held that "all three of the charged crimes were for one ultimate purpose, sale of methamphetamine for financial gain. All of the acts in each of the three target crimes were incidental to this objective, and many acts were a direct part of more than one of the crimes. Under these circumstances, but one count of conspiracy can be sustained." (*Id.* at pp. 1558–1559.)

### 3. *Meneses*.

In *People v. Meneses* (2008) 165 Cal.App.4th 1648 (*Meneses*), the defendant was convicted of multiple crimes, including conspiring to steal public records and to commit insurance fraud. (*Id.* at p. 1651.) The defendant had purchased police reports improperly taken from a police department. (*Id*. at p. 1652.) He used information from those reports to contact accident victims, whom he referred to attorneys and chiropractors in exchange for fees. (*Id.* at p. 1653.) The defendant encouraged many of the victims to inflate their insurance claims by receiving unnecessary medical care. (*Id.* at pp. 1654–1658.) The *Meneses* court affirmed the defendant's nine convictions for conspiracy. (*Id.* at pp. 1667, 1673.)

---

**23** Emanuel also cites *Liu*, *supra*, 46 Cal.App.4th 1119, but *Liu* is not instructive in this situation. The *Liu* court rejected the defendant's argument that he had suffered duplicative conspiracy convictions when he agreed to murder a husband and wife. (*Id.* at pp. 1132–1133.) The *Liu* court held that the separately planned murders were separate conspiracies. (*Id.* at p. 1133.) The *Liu* court also determined that the defendant had separate motives in planning to kill the husband and wife, which was sufficient to uphold the separate convictions. (*Ibid*.)

The *Meneses* court rejected an argument that "one overall insurance fraud conspiracy" had existed. (*Meneses*, *supra*, 165 Cal.App.4th at p. 1671.) Instead, the defendant had independently obtained the stolen police reports, used them to contact injured insureds, referred those insureds to a number of different lawyers and chiropractors, and then encouraged the insureds to file false insurance claims with various insurers. According to the *Meneses* court, the only common element is each conspiracy was the defendant himself, who formed separate confederations with various parties at different times for different transactions. (*Ibid.*) The *Meneses* court concluded that the defendant's nine convictions for the conspiracies were proper. (*Id.* at p. 1672.)

### 4. *Jasso*.

In *People v. Jasso* (2006) 142 Cal.App.4th 1213 (*Jasso*), a prison inmate was convicted of three counts of conspiracy to import drugs into the prison based on numerous phone calls to one contact, who coordinated with the wives of several different inmates who planned to visit their husbands in prison. The contact would obtain the drugs, package them, and give them to the visitor, who would conceal the drugs on her body. On three different days within a two-month period, three separate women visiting the prison were searched and found to be carrying drugs. (*Id.* at pp. 1216–1219.) The jury was not instructed to determine the number of conspiracies. The *Jasso* court reversed all three conspiracy convictions after concluding that a properly instructed jury could have found a single conspiracy because all three charged "conspiracies occurred during the same narrow time frame and involved the same modus operandi," notwithstanding the existence of multiple attempts on different days to smuggle the drugs into prison using different women as couriers. (*Id.* at pp. 1221–1223.)

### 5. *Kopp*.

In a supplemental letter, Emanuel asked us to review *People v. Kopp* (2019) 38 Cal.App.5th 47 (*Kopp*), review granted November 13, 2019, S257844. In *Kopp*, two

defendants were convicted of conspiracy to commit murder and conspiracy to dissuade a witness, among other crimes. (*Id.* at p. 55.) On appeal, it was determined that instructional error had occurred because the trial court had not asked the jury to determine whether one or two conspiracies existed. (*Id.* at p. 56.) The *Kopp* court concluded that, in contrast to *Meneses*, *supra*, 165 Cal.App.4th 1648, the same two coconspirators (the defendants) were involved in the two alleged conspiracies. One defendant would convey what needed to be done to prevent two key witnesses from testifying against him, and the other defendant would communicate those instructions to another person. (*Kopp*, *supra*, 38 Cal.App.5th at p. 86, review granted Nov. 13, 2019, S257844.) The same evidence and overt acts where used to prove the existence of the conspiracies. The *Kopp* court held this was "one of those unique cases wherein it is apparent that only one conspiracy existed." (*Id.* at pp. 87–88.) The convictions for conspiracy to dissuade a witness were reversed because the instructional error was prejudicial. (*Id.* at p. 88.)

### 6. The present matter.

The flaw in Emanuel's argument is that no evidence demonstrates that Mena (who agreed to supply the stolen vehicle) was part of Emanuel's conspiracy to commit murder. To the contrary, the evidence strongly suggests that Mena neither knew about the planned murder nor was part of the conspiracies for that murder. When Emanuel spoke with Mena, Mena asked if he was going to get the vehicle back. Emanuel advised, "I don't think you'll want it back after what they're going to use it for." Mena laughed and said they would just get another stolen vehicle.[24]

Further, Emanuel's agreement with Mena involved a different criminal motive than Emanuel's agreement with other gang members to commit murder. The agreements

---

[24] We also note that, when Mena's name was first mentioned at trial in connection with supplying the stolen vehicle, the prosecutor commented that Mena's name was new to the jury.

27.

to commit these crimes occurred at slightly different times and at different places. These crimes targeted different victims. Thus, the relevant factors strongly suggest that Emanuel's agreement with Mena was a separate conspiracy. (See *Meneses*, *supra*, 165 Cal.App.4th at p. 1672 [listing factors a court should consider when determining if multiple conspiracies overlap].)

Unlike in *Lopez* and *Kopp*, Emanuel did not commit these conspiracies with the same group of conspirators. Unlike in *Jasso*, Emanuel's crimes did not involve the same modus operandi. Instead, this situation is more similar to *Meneses* and *Kotteakos*. Emanuel agreed with different conspirators to complete different crimes. Although Emanuel intended for other gang members to use the stolen vehicle when committing murder, his criminal agreement with Mena was not part of a single criminal enterprise. Therefore, we reject Emanuel's assertion that "Mena's knowledge is irrelevant to this issue."

Based on this record, substantial evidence supports Emanuel's conviction in count 67. We agree with respondent that Emanuel entered into a conspiracy with Mena to purchase or receive a stolen vehicle (count 67), and that agreement was separate from Emanuel's agreement with other gang members to commit murder (count 65). Likewise, Emanuel's traditional conspiracy in count 65 was a separate crime from his gang conspiracy in count 69 to commit the same murder. Thus, Emanuel's conspiracies in counts 65, 67 and 69 were based on different facts and elements.[25] Consequently, reversal of the conviction in count 67 is not warranted, and this claim fails.

III. **Any Presumed Instructional Error Was Harmless Regarding The Disputed Conspiracy Charges.**

Appellants claim that the trial court abused its discretion in failing to instruct the jury to decide whether a single or multiple conspiracies existed. Cervando also

---

[25]    For this reason, we likewise reject Emanuel's assertion that his double jeopardy rights were violated. He was neither convicted of nor punished for the same offenses.

alternatively asserts that his defense counsel was ineffective in failing to request such an instruction.

California appellate courts are currently divided on whether a trial court has a duty to instruct a jury on single versus multiple conspiracies. (*People v. Williams* (2015) 61 Cal.4th 1244, 1270; *Meneses*, *supra*, 165 Cal.App.4th at p. 1668.) Two older cases hold that no such duty exists to instruct because the issue is not a question of fact for a jury. (See *Liu*, *supra*, 46 Cal.App.4th at p. 1133; *People v. McLead* (1990) 225 Cal.App.3d 906, 921.) On the other hand, more recent opinions impose a duty on a court to instruct the jury to determine whether a single or multiple conspiracies exist. However, that duty only arises " 'when there is evidence to support alternative findings.' " (*Jasso*, *supra*, 142 Cal.App.4th at p. 1220, quoting *People v. Vargas*, *supra*, 91 Cal.App.4th at p. 554.) "Specifically, an instruction is warranted where the evidence could support a finding that there was one overall agreement among the various parties to perform various functions in order to carry out the objectives of the conspiracy." (*Jasso*, *supra*, 142 Cal.App.4th at p. 1220.)

Here, the parties dispute several points. They disagree whether this court should adopt the holdings from the older versus the more recent opinions. They also disagree whether the evidence warranted the court to instruct the jury to determine if more than one conspiracy existed.[26]

We need not resolve the parties' various disputes. Even if we presume that the court had an obligation to instruct the jury to decide whether one conspiracy or multiple conspiracies existed for any particular criminal incident, it is beyond any reasonable doubt that appellants did not suffer prejudice. As such, we proceed directly to the issue of harmless error.

---

[26] Cervando argues that the trial court should have read the jury CALJIC No. 17.05 or a similar instruction, telling the jury to decide the factual question whether there was one, or more than one, conspiracy.

29.

We have already determined that Cervando's conviction in count 101 must be reversed for insufficient evidence. That conspiracy was part of the same conspiracy in count 103 regarding the same cocaine. However, Cervando's remaining disputed conspiracy convictions in counts 19, 20, 103 and 105 were different crimes, and they were based on different facts or elements. Likewise, Emanuel's disputed conspiracy convictions in counts 65, 67 and 69 were different crimes, and they were based on different facts or elements.

Based on this record, it is beyond any reasonable doubt that the presumed instructional error was harmless. (See *Chapman v. California* (1967) 386 U.S. 18, 24.) Apart from Cervando's conviction in count 101, appellants' remaining disputed conspiracy convictions were proper. Thus, we can declare that the other guilty verdicts rendered in this trial were surely unattributable to the presumed instructional error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Accordingly, the alleged instructional error did not cause prejudice, and reversal is not warranted for appellants' remaining disputed conspiracy convictions.[27]

## IV. The Jury's True Findings Must Be Reversed For Cervando's Firearm Enhancements Under Section 12022.4 In Counts 19 And 163.

Cervando asserts that insufficient evidence supports the jury's true findings regarding the firearm enhancements found true under section 12022.4, subdivision (a), in count 19 (conspiracy to commit home invasion robbery) and count 163 (attempted home invasion robbery). He contends that these true findings must be reversed.

---

[27] For the same reason, even though Cervando's trial counsel did not request any jury instruction regarding possible multiple conspiracies, Cervando does not demonstrate ineffective assistance of counsel because he does not establish prejudice. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687–688; *People v. Lucas* (1995) 12 Cal.4th 415, 436 [a defendant bears the burden to establish prejudice when raising a claim of ineffective assistance of counsel].)

## A. Standard of review.

We have already set forth the standard of review for a challenge to the sufficiency of the evidence. We look for substantial evidence to support these true findings, and that evidence must be reasonable, credible and of solid value. We presume every inference in support of the judgment that the finder of fact could reasonably have made. We do not reweigh the evidence or reevaluate witness credibility. We cannot reverse the judgment merely because the evidence could be reconciled with a contrary finding. (See *People v. D'Arcy*, *supra*, 48 Cal.4th at p. 293.)

## B. Background facts.

We have already provided some of the material facts about the crimes charged in count 19 (conspiracy to commit home invasion robbery) and count 163 (attempted home invasion robbery). From August 24 through August 25, 2015, law enforcement intercepted numerous communications involving Sanchez, appellants and other Norteño gang members. They assembled and equipped gang members to rob two residences in Visalia.

We provide some additional facts regarding the firearms used in this operation. Emanuel informed Sanchez that the men would have black handguns for this operation. During the planning stage, Cervando contacted Emanuel, and he told Emanuel that the men had failed to bring bullets for "their" guns. Emanuel then reported to Sanchez that the men did not have bullets for the firearms "that they brought." Later, another gang member asked Emanuel to supply a firearm (an "AK"). This gang member told Emanuel that other gang members came with two firearms, a .40-caliber and a .22-caliber, but the .40-caliber did not have any ammunition. Via a text message, Emanuel indicated he would send his "AK" to use in this operation.

Cervando spoke with Sanchez, and they discussed various topics related to the planned robberies. Cervando told Sanchez that the men brought one gun but no ammunition, "so they went to go get ammo for it right now . . . ." Cervando and Emanuel

31.

later discussed the planned robberies. Emanuel asked if it was true that none of "their" firearms had bullets. Cervando indicated that everyone had bullets. Another gang member joined the call and he told Emanuel that everyone had weapons and they were all loaded.

Finally, Emanuel spoke with a gang member and asked the gang member to get his (Emanuel's) firearm ("strap"). The other gang member asked Emanuel why he needed a firearm, noting the gang members were already armed and Emanuel was not going to go on this operation. Emanuel said he was going to use his vehicle and he did not want to be "strapless" if the victims came out. The other gang member said the victims were "an old guy and an old lady."

Law enforcement intervened as the gang members were driving towards the intended target residences. Appellants had been in a second vehicle that was closely following the first vehicle used in this operation. The first vehicle led law enforcement on a high-speed chase. The five gang members inside the first vehicle were eventually taken into custody, and five loaded firearms were eventually recovered.

At trial, Emanuel testified that the firearms used in this operation were not provided by Cervando but were supplied by other gang members.

### C. Analysis.

Cervando asserts that he did not obtain or furnish the firearms that were to be used during the planned home invasion robberies on August 25, 2015. He contends the other men brought their own guns. He maintains that the firearm enhancements found true under section 12022.4 in counts 19 and 163 must be reversed.[28] We agree.

---

[28] As a reminder, Cervando received an additional and consecutive two years in count 19 for the firearm enhancement found true under section 12022.4, subdivision (a). He received the same enhancement in count 163, but that sentence was stayed. In these two counts, the jury also found true firearm enhancements under section 12022, subdivision (a)(1). Cervando does not challenge the sufficiency of the evidence

32.

Section 12022.4 imposes a sentencing enhancement when a person, "during the commission or attempted commission of a felony, furnishes or offers to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person or any other person to commit a felony . . . ." (§ 12022.4, subd. (a).)

In this matter, no evidence establishes or even reasonably suggests that Cervando furnished or offered to furnish a firearm to another person for these attempted robberies. Instead, the evidence strongly infers that the gang members obtained the firearms through other means. For instance, Cervando told Emanuel that the men had failed to bring bullets for "their" guns. Emanuel told Sanchez that the men did not have bullets for the firearms "that they brought." Another gang member asked Emanuel to supply a firearm (an "AK"). This gang member told Emanuel that other gang members came with two firearms, a .40-caliber and a .22-caliber, but the .40-caliber did not have any ammunition.

Cervando spoke with Sanchez, and they discussed various topics related to the planned robberies. Cervando told Sanchez that the men brought one gun but no ammunition, "so they went to go get ammo for it right now . . . ." Cervando and Emanuel discussed the planned operation. Emanuel asked if it was true that "none of their guns got bullets?" Cervando indicated that everyone then had bullets. Another gang member joined the call and he told Emanuel that everyone had weapons and they were all loaded.

Respondent argues that "Cervando was actively involved in the planning of the robberies and in preparing the men to commit those crimes." Respondent notes that, like Emanuel, Cervando was a "higher-ranking" member of the Norteño gang. Respondent emphasizes that Cervando assisted Emanuel and Sanchez in organizing the men and the items they needed to successfully rob the two targeted residences. Respondent notes that the intent of section 12022.4 is to punish and deter an individual from knowingly

---

regarding those other firearm enhancements (§ 12022, subd. (a)(1)) which the jury found true in these counts.

33.

furnishing a gun to be used in the commission of a felony, and respondent argues that enhancement should apply to Cervando in this situation. Respondent urges us to deny this claim. We reject respondent's arguments.

Although Cervando was involved in the planning of these attempted robberies, the evidence does not demonstrate that he furnished or offered to furnish a firearm to another person for the purpose of aiding, abetting, or enabling that person (or any other person) to commit the attempted robberies. (§ 12022.4, subd. (a).) While it is possible Cervando provided (or offered to provide) a firearm to one of the gang members, a mere possibility is nothing more than speculation, and speculation does not amount to substantial evidence. (*People v. Ramon* (2009) 175 Cal.App.4th 843, 851.) An inference must not be based on suspicion, imagination, surmise, conjecture, guesswork or supposition. (*People v. Davis* (2013) 57 Cal.4th 353, 360.) Instead, a finding of fact must be an inference drawn from evidence rather than mere speculation as to probabilities without evidence. (*People v. Ramon*, *supra*, 175 Cal.App.4th at p. 851.) The inferences from this record do not reasonably demonstrate that Cervando provided a firearm for these crimes.

The prosecution failed to prove beyond a reasonable doubt that Cervando furnished or offered to furnish a firearm to another for the purpose of aiding, abetting, or enabling that person (or any other person) to commit the felonies charged in counts 19 and 163. (§ 12022.4, subd. (a).) Substantial evidence does not support the jury's true findings in this regard. Accordingly, we will reverse these true findings, and retrial is barred due to insufficiency of the evidence. (See *Lockhart v. Nelson*, *supra*, 488 U.S. at p. 39.) We remand Cervando's matter for resentencing.[29]

---

[29] To assist the parties at resentencing, we note that Cervando does not challenge the sufficiency of the evidence regarding the other firearm enhancements (§ 12022, subd. (a)(1)) found true in counts 19 and 163.

**V.    The Trial Court's Pronouncement Of Sentence Against Emanuel Was Improper In Counts 18, 20, 35, 69, 72 and 73 Because It Imposed Both Consecutive And Stayed Sentences.  Because Of These And Other Errors We Vacate Emanuel's Sentence And Remand His Matter For Resentencing.**

The parties agree, as do we, that the trial court pronounced incorrect sentences in counts 18, 20, 35, 69, 72 and 73.  For those counts, the court imposed consecutive sentences but it also stayed them.[30]  The abstracts of judgment reflect that consecutive sentences were imposed for these counts, and that these sentences were also stayed.

It is improper to impose a consecutive sentence and then to simultaneously stay such a sentence.  (*People v. Cantrell* (2009) 175 Cal.App.4th 1161, 1164.)  Instead, the trial court should have imposed a sentence on these counts and then stayed execution of those sentences as necessary to comply with section 654; that way, if the unstayed sentences are ever reversed, valid sentences remain.  (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1469.)

Although respondent agrees that these sentencing errors occurred, respondent asserts that we should correct these errors on appeal.  Likewise, Emanuel contends that this court should correct these sentencing errors and modify his abstracts of judgment.  We decline to correct these sentencing errors on appeal because other sentencing issues exist.

As we explain below in section VI, it is appropriate for the court to exercise its discretion under Senate Bill No. 620 regarding the firearm enhancement (§ 12022.53, subds. (c) & (e)(1)) found true against Emanuel in count 73 (attempted murder).  In addition, we agree with the parties in section VII below, that the court failed to articulate factors in aggravation in support of the upper-term sentencing enhancements it imposed

---

[30]    Respondent concedes that the trial court should have imposed full sentences in these counts but then suspended the execution of those sentences "without making a determination as to whether they should be served concurrently or consecutively."

against Emanuel in counts 19 and 29. Finally, as we explain in section VIII below, other errors exist in Emanuel's abstracts of judgment.

Because sentencing errors occurred in counts 18, 20, 35, 69, 72 and 73, and because other sentencing errors and clerical mistakes exist, it is appropriate to vacate Emanuel's sentence and remand his matter for resentencing. (See § 1260 [an appellate court may "remand the cause to the trial court for such further proceedings as may be just under the circumstances."].) At resentencing, the court is directed to impose sentences in counts 18, 20, 35, 69, 72 and 73 in a manner that complies with section 654. If those sentences are again stayed, it is improper to also impose consecutive or concurrent terms.

## VI. When Emanuel Is Resentenced, The Court Shall Exercise Its Discretion Under Senate Bill No. 620 Regarding The Firearm Enhancement Found True In Count 73.

At the time of Emanuel's 2017 sentencing in this matter, the trial court was required to impose an additional prison sentence for the firearm enhancement (§ 12022.53, subds. (c) & (e)(1)) found true in count 73 (attempted murder). Because of this enhancement, the court imposed but stayed an additional and consecutive 20 years in count 73.[31]

After Emanuel was sentenced, the Governor approved Senate Bill No. 620 (2017–2018 Reg. Sess.) (Senate Bill 620), which amended, in part, section 12022.53. Under the amendment, a trial court now has discretion to strike or dismiss the firearm enhancement that was found true in count 73. (§ 12022.53, subd. (h).)

---

[31] In addition to this firearm enhancement in count 73, the court also imposed additional consecutive terms for other firearm enhancements found true in counts 19 and 163. For those other firearm enhancements, however, the court imposed (but stayed) the maximum possible sentence of three years. In raising this claim, Emanuel does not contend that remand is required for the court to exercise its sentencing discretion under Senate Bill No. 620 for those other firearm enhancements found true in counts 19 and 163.

Respondent agrees, as do we, that this amendment applies retroactively to Emanuel because his case is not yet final on appeal. However, respondent contends that a remand would serve no purpose. According to respondent, no reasonable court would exercise its discretion to strike Emanuel's firearm enhancement. (See *People v. Gutierrez* (1996) 48 Cal.App.4th 1894, 1896 [finding it unnecessary to remand matter for trial court to consider retroactive discretionary authority].)

To support its arguments, respondent notes that, at sentencing, Emanuel's counsel had argued that Emanuel should not be sentenced to 25 years to life for the three conspiracy to commit murder counts (17, 65 and 71). His counsel had noted that, because these were conspiracy convictions, the jury had not found that Emanuel had held an intent to kill. The court, however, imposed 25 years to life on each of those conspiracy convictions. Emanuel received an aggregate determinate sentence of 10 years eight months. A consecutive aggregate indeterminate sentence of 100 years to life was imposed. Based on the court's sentencing choices, respondent argues that a remand is not warranted for the court to exercise its discretion under Senate Bill 620. We disagree.

Prior to sentencing, the probation officer had recommended the maximum possible sentence for Emanuel—an aggregate determinate sentence of 11 years eight months, and a consecutive aggregate indeterminate term of 100 years. The probation officer had stated that aggravated terms were recommended for both the primary determinate term and for the special allegations that contained a sentencing triad.

The court, however, did not follow the probation officer's recommendations.[32] In count 29 (conspiracy to purchase or receive a stolen vehicle), the court went against the

---

[32] The probation officer had advised that "[a]ggravated terms have been chosen for the single, primary, determinate term and for the special allegations that contain a triad because Probation found no factors in mitigation apply to this case and numerous aggravating factors do apply."

recommendation and imposed the middle term of two years.  This count was the base term for the determinate sentence.

Whether through oversight or a decision not to follow the recommendations from probation, the court failed to impose the maximum possible sentence against Emanuel. As such, nothing rules out the possibility, however slight, that the court might exercise its discretion favorably for Emanuel to strike or dismiss the firearm enhancement (§ 12022.53, subds. (c) & (e)(1)) found true in count 73 (attempted murder).  (See *People v. McDaniels* (2018) 22 Cal.App.5th 420, 427–428 [remand appropriate, in part, because sentencing court expressed no intent to impose the maximum sentence].)  Moreover, it is also possible that the court could impose a lesser-included enhancement, such as a 10-year term under section 12022.53, subdivision (b), in lieu of the 20-year sentence it imposed for this firearm enhancement.  (See *People v. Morrison* (2019) 34 Cal.App.5th 217, 222–223 [trial courts are not limited to simply imposing or striking an enhancement under section 12022.53 but may impose an uncharged lesser-included enhancement under that section].)

Because the court did not impose the maximum sentence against Emanuel and because we are remanding his matter for resentencing based on other issues, it is appropriate for the court to exercise its discretion under Senate Bill 620 for the firearm enhancement found true in count 73.  We express no opinion regarding how the court should exercise that discretion when Emanuel is resentenced.

**VII.  The Trial Court Failed To Articulate Reasons In Support Of The Upper-Term Sentence Enhancements It Imposed Against Emanuel In Counts 19 And 29.  At Emanuel's Resentencing, The Court Shall Clarify Its Sentencing Choices In This Regard.**

At Emanuel's sentencing, the trial court imposed a consecutive upper-term sentence of three years for the firearm enhancement (§ 12022.4, subd. (a)) found true in count 19 (conspiracy to commit home invasion robbery).  In count 29 (conspiracy to

purchase or receive a stolen vehicle), the court imposed a consecutive upper-term sentence of four years for the gang enhancement (§ 186.22, subd. (b)(1)(A)) found true.

The parties agree, as do we, that the court erred when it failed to state reasons to justify these upper-term enhancements.[33]  (See § 1170, subd. (c); see also Cal. Rules of Court, rules 4.406(b)(4) & 4.420(e).)[34]  Despite agreeing that error occurred, respondent nevertheless argues that Emanuel has forfeited this issue on appeal due to a failure to object at sentencing.  To overcome forfeiture, Emanuel raises a claim of ineffective assistance of counsel, which respondent disputes.

We need not resolve the parties' disagreements regarding forfeiture and ineffective assistance of counsel.  We have already determined that resentencing is appropriate.  We express no opinion regarding how the court should resentence Emanuel.  However, when Emanuel is resentenced, the trial court is required to state its reasons in support of its discretionary sentencing choices.  (§ 1170, subd. (c); rules 4.406(b)(4) & 4.420(e).)

## VIII.  Appellants' Abstracts Of Judgment Contain Other Clerical Errors Which Must Be Corrected.

Emanuel raises claims involving various errors in his abstracts of judgment. Cervando also raises a claim involving an error in his determinate abstract of judgment. Respondent agrees, as do we, that the following must be corrected.

---

[33]  Emanuel notes that, while the probation report recommended the upper terms for these sentencing enhancements in counts 19 and 29, the report provided no specific rationale as to why those recommendations were made.  As such, Emanuel argues it does not appear that the trial court adopted the reasoning of the probation report.

[34]  All future references to rules are to the California Rules of Court unless otherwise noted.

### A. Emanuel's conviction in count 43 was erroneously entered in his abstract of judgment.

A clerical error occurred on Emanuel's verdict form for count 43 (conspiracy to commit extortion). Because of that clerical error (which Emanuel does not contest),[35] an incorrect conviction was entered on his indeterminate abstract of judgment. Following Emanuel's resentencing, his indeterminate abstract of judgment should reflect that he was convicted of *conspiracy to commit extortion* and not for the crime of extortion.

### B. Emanuel is entitled to two additional days of actual custody credits and the court shall determine if this alters his total credits.

At Emanuel's sentencing on September 7, 2017, he was awarded actual custody credits of 708 days. He was also awarded 106 days of "local conduct" credit, which represented 15 percent of his actual custody credits. (See § 2933.1, subd. (a).) These were combined to award Emanuel 814 days of "total credits" for his presentence custody.

Emanuel, however, was entitled to two additional days of actual credit. On September 1 and 2, 2015, Emanuel spent two days in jail serving time on the charge in count 127 (possession of an assault weapon). In addition to those two days in custody, Emanuel was in jail continuously from October 1, 2015, through his sentencing on September 7, 2017. At Emanuel's sentencing on September 7, 2017, his additional two days of credit were not awarded due to an oversight.

We agree with the parties that, instead of 708 actual days of custody credits, Emanuel is entitled to 710 days. (See *People v. Bravo* (1990) 219 Cal.App.3d 729, 735 [a sentencing court must award credits for all days in custody up to and including the day of sentencing.].) Therefore, we direct the court to award Emanuel 710 days of actual

---

[35] In raising this claim, Emanuel cites *People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272–1273, and impliedly agrees that the error appearing in the verdict form for count 43 may be disregarded as a technical defect. Because Emanuel agrees that the error in his verdict form was a mere technical defect, we take no further action other than to direct the trial court to ensure that Emanuel's indeterminate abstract of judgment properly lists the conviction in count 43.

custody credits and to determine if his "total credits" should be increased above 814 days.**36**  (See § 2933.1, subd. (a).)

C.      **Appellants' abstracts of judgment must reflect each imposed fee, fine and assessment.**

At appellants' respective sentencings, the trial court imposed various fines and assessments totaling $585.  The court stated that these specific amounts were set forth in the respective probation reports.  The probation reports itemize the various fines and assessments.  However, while appellants' respective determinate abstracts of judgment state that the court imposed $585 in fines, the abstracts do not delineate the statutory basis for each amount, or separate out the individual amounts.

An abstract of judgment must itemize any imposed fines and fees.  (*People v. High* (2004) 119 Cal.App.4th 1192, 1200; see also *People v. Sharret* (2011) 191 Cal.App.4th 859, 864 [trial court's generic reference to " 'penalty assessments' " was acceptable when those amounts were itemized in the abstract of judgment].)  As such, following appellants' respective resentencings, the court shall ensure that their determinate abstracts of judgment properly itemize each imposed fee, fine and assessment.

IX.    **Because We Are Remanding Appellants' Matters For Resentencing We Need Not Address Whether The Trial Court Abused Its Discretion When Imposing Maximum Restitution Fines; In Any Event, Appellants' Constitutional Rights Were Not Violated.**

Appellants were represented by the same attorney during the proceedings below.  During their respective sentencing hearings, appellants' counsel objected to the $10,000 maximum restitution fine which probation had recommended.  However, appellants

---

**36**      Emanuel claims that, because he is entitled to the two additional days of actual custody credits, then his total credits should be likewise increased by two days to 816.  He is incorrect.  His local conduct credits are limited to 15 percent, and no more than 15 percent, of his worktime credit.  (§ 2933.1, subd. (a); *People v. Ramos* (1996) 50 Cal.App.4th 810, 816.)  Upon remand, we will direct the court to recalculate Emanuel's "total" credits based on 710 days of actual custody.

41.

neither presented evidence nor made an offer of proof demonstrating their alleged inability to pay this amount. Without commenting on appellants' objections and without determining their ability to pay, the court imposed maximum restitution fines against appellants.

Cervando asserts that the trial court abused its discretion by failing to consider his ability to pay. Emanuel joins this claim. They contend that remand is required for the court to determine whether they have the ability to pay, and they argue that they are financially unable to pay this amount.[37]

Respondent argues that the trial court did not abuse its discretion when imposing the maximum restitution fines against appellants. According to respondent, appellants failed to provide evidence establishing their inability to pay, and the court was not required to make express findings. Moreover, respondent contends that, based on information contained in the probation reports, appellants have the ability to pay. Respondent asserts that remand is not required for the court to consider appellants' ability to pay the restitution fines.

In their reply briefs, appellants cite *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*). They contend *Dueñas* provides additional support establishing that the trial court abused its discretion in failing to determine if they had an ability to pay.

---

**37** According to Cervando's probation report, he worked fulltime and earned $10 an hour unloading cargo at a distribution center. He had worked there about six months. He supported himself and his minor daughter. Prior to that job he had worked in packing houses, in warehouses, and as a farm laborer. He had no reported assets.

According to Emanuel's probation report, he had been unemployed for 10 months prior to his arrest, and he was receiving financial assistance of $1,295 per month as a disabled Army veteran, and $2,900 per month from the GI Bill. He told probation that he suffers from posttraumatic stress disorder. Emanuel owned a 2008 BMW automobile, which his mother was driving. He was unaware of its value or the debt against it. He owed $4,000 in child support arrearages, which he was disputing because he claimed to have had full custody of his children during the time these payments were due.

As we discuss below, we need not resolve whether the trial court abused its discretion when imposing the maximum restitution fines. Instead, we are remanding appellants' matters for resentencing. If the court again imposes restitution fines above the statutory minimum, appellants bear the burden to prove an inability to pay. (§ 1202.4, subd. (d).) In any event, we also conclude that *Dueñas* is inapplicable in this matter, and it has no application when appellants are resentenced.

**A.** **Because we are remanding for resentencing, we need not resolve whether the trial court abused its discretion when imposing the maximum restitution fines against appellants.**

When appellants were sentenced in 2017, the minimum restitution fine was $300 and the maximum was $10,000. Section 1202.4 provides that a sentencing court "shall" impose a restitution fine unless it finds "compelling and extraordinary reasons" for not doing so and states those reasons on the record. (§ 1202.4, subd. (c).) A defendant's inability to pay may not be considered a compelling and extraordinary reason not to impose a restitution fine, but an inability to pay may be considered when the restitution fine is increased beyond the minimum amount. (*Ibid*.) When a restitution fine exceeds the statutory minimum, the defendant bears the burden of proving an inability to pay. (*Id.* at subd. (d).)

We are already remanding appellants' respective matters for resentencing. As such, we need not resolve whether or not the trial court abused its discretion when it imposed maximum restitution fines against appellants. Instead, if the court again imposes restitution fines above the statutory minimum, appellants bear the burden to prove an inability to pay. (§ 1202.4, subd. (d).) "Express findings by the court as to the factors bearing on the amount of the fine shall not be required. A separate hearing for the fine shall not be required." (*Ibid.*) We leave it to the court and the parties to resolve this issue if it is again raised at resentencing. As we discuss below, however, *Dueñas* is inapplicable in this matter and appellants' constitutional rights were not violated.

### B. *Dueñas* is inapplicable and appellants' constitutional rights were not violated.

Cervando cites *Dueñas*, *supra*, 30 Cal.App.5th 1157, for the proposition that due process is violated when a restitution fine is imposed on an indigent defendant without first determining an ability to pay. Similarly, Emanuel asserts that *Dueñas* "is directly on point" for the proposition that section 1202.4 impermissibly prohibits a court from considering a defendant's ability to pay.[38] Emanuel asks this court to stay the execution of a restitution fine until and unless the People demonstrate that he has the ability to pay. He contends that the imposition of a maximum restitution fine will "limit his rights because of his inability to pay."[39]

We reject appellants' various arguments based on *Dueñas*. Their respective constitutional rights were not violated. Further, we will not stay execution of the restitution fines against them, and *Dueñas* has no application when appellants are resentenced.

Much has been written about *Dueñas*, both from this court and around the state. (See *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1052–1053 (*Lowery*); *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1063–1065.) The defendant in *Dueñas* lost her driver's license because she was too poor to pay juvenile citations. (*Dueñas, supra*, 30 Cal.App.5th at p. 1161.) She continued to offend because aggregating criminal conviction assessments and fines prevented her from recovering her license. (*Ibid.*) The *Dueñas* court described this as "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [the defendant's] poverty."

---

[38]    As Emanuel notes, elsewhere in the Penal Code it is declared that "[r]estitution shall be consistent with a person's ability to pay." (§ 1203.2, subd. (a) [dealing with the rearrest of a supervised person].)

[39]    In a footnote, Emanuel notes that his veteran's benefits may be either greatly reduced or completely terminated after 61 days of incarceration. (See <https://benefits.va.gov/persona/veteran-incarcerated.asp> [as of December 7, 2020].)

(*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.) The *Dueñas* court concluded the defendant faced ongoing unintended punitive consequences because of the imposed financial obligations. *Dueñas* determined those unintended consequences were "fundamentally unfair" for an indigent defendant under principles of due process. (*Id.* at p. 1168.)

The *Dueñas* court concluded that due process requires a trial court to conduct an ability to pay hearing, and ascertain a defendant's present ability to pay, before it imposes certain assessments under section 1465.8 and Government Code section 70373. (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1164.) *Dueñas* also held that, although section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine. (*Ibid.*)

We decline to expand *Dueñas*'s holding beyond the unique facts found in *Dueñas*. In *Lowery*, two defendants were convicted for a series of armed robberies, and various fees, fines and assessments were imposed against them. (*Lowery*, *supra*, 43 Cal.App.5th at pp. 1048–1049.) Based on *Dueñas*, the defendants in *Lowery* challenged the imposition of some of those financial obligations. The *Lowery* court, however, rejected a due process challenge based on *Dueñas*. The *Lowery* court noted the "unique concerns addressed in *Dueñas*" were lacking. (*Lowery*, *supra*, at p. 1056.) Nothing established or even reasonably suggested the two defendants in *Lowery* faced ongoing unintended punitive consequences stemming from the imposition of fees, fines and assessments. The defendants did not establish how they suffered a violation of a fundamental liberty interest. To the contrary, the defendants had been incarcerated not because of their alleged indigency but because they were convicted of intentional criminal acts. Because unintended consequences were not present, the *Lowery* court held it was not fundamentally unfair for the trial court to impose fees, fines and assessments against the

defendants without first determining their ability to pay. (*Lowery*, *supra*, at pp. 1056–1057.)

As in *Lowery*, the unique concerns addressed in *Dueñas* are lacking here. Appellants do not establish the violation of a fundamental liberty interest. Their incarcerations were not a consequence of prior criminal assessments and fines. They were not deprived of liberty because of their alleged indigency. They were not caught in a cycle of "cascading consequences" stemming from "a series of criminal proceedings driven by, and contributing to, [their] poverty." (*Dueñas*, *supra*, 30 Cal.App.5th at pp. 1163–1164.) Appellants could have avoided the present convictions regardless of their financial circumstances. *Dueñas* is distinguishable and it has no application in this matter. (*Lowery*, *supra*, 43 Cal.App.5th at pp. 1054–1055.) In short, it was not fundamentally unfair for the trial court to impose the restitution fine and the assessments in this matter without first determining appellants' respective ability to pay. Therefore, we reject appellants' constitutional challenges and the applicability of *Dueñas* in this matter. (See *Lowery*, *supra*, 43 Cal.App.5th at pp. 1056–1057.) Accordingly, we will not stay the execution of restitution fines against them, and *Dueñas* is inapplicable when appellants are resentenced.

## DISPOSITION

### For Cervando

Cervando's conviction in count 101 is reversed. The true findings in counts 19 and 163 regarding the firearm enhancements under section 12022.4, subdivision (a), are reversed.[40] Cervando's sentence is vacated and his matter is remanded for resentencing. Following resentencing, the court shall ensure that Cervando's determinate abstract of judgment properly itemizes each imposed fee, fine and assessment. The court shall

---

[40] To assist the parties at resentencing, we note that Cervando does not challenge the sufficiency of the evidence regarding the other firearm enhancements (§ 12022, subd. (a)(1)), found true in counts 19 and 163.

46.

forward new abstracts of judgment to the appropriate authorities.[41] In all other respects, Cervando's judgment is affirmed.

### For Emanuel

Emanuel's sentence is vacated and his matter is remanded for resentencing. The court shall impose sentences in counts 18, 20, 35, 69, 72 and 73 in a manner that complies with section 654. If these sentences are stayed, the court shall not also impose consecutive or concurrent sentences.[42] When resentencing Emanuel, the court shall exercise its discretion under Senate Bill 620 for the firearm enhancement (§ 12022.53, subds. (c) & (e)(1)) found true in count 73. In addition, if the court again imposes upper-term sentence enhancements in counts 19 and 29, the court shall justify its sentencing choices as required under section 1170, subdivision (c), and rules 4.406(b)(4) & 4.420(e). The court shall award Emanuel 710 days of actual custody credits and determine if Emanuel is entitled to any additional total credits beyond 814 days. The court shall ensure that the indeterminate abstract of judgment properly reflects that Emanuel was convicted in count 43 of *conspiracy to commit extortion*. Finally, the court shall ensure that the determinate abstract of judgment properly itemizes each imposed fee, fine and

---

[41] To assist the clerk at resentencing, we note that additional errors (not raised by the parties) appear in Cervando's determinate abstract of judgment: (1) The conviction in count 20 erroneously lists section *185.5* instead of section *182.5*; (2) The gang enhancement in count 84 erroneously lists section 186.22, subdivision (b)(1)(*B*), instead of section 186.22, subdivision (b)(1)(*A*); (3) The firearm and gang enhancements imposed and stayed in count 85 are missing; (4) The gang enhancement imposed and stayed in count 91 is missing; (5) The abstract fails to show that the sentence imposed in count 101 was stayed; and (6) The abstract erroneously states that the sentence imposed in count 104 was stayed.

[42] Although Cervando did not raise a similar claim, the trial court should also comply, if necessary, with the requirements of section 654 when resentencing Cervando.

assessment.  Following resentencing, the court shall forward new abstracts of judgment to the appropriate authorities.  In all other respects Emanuel's judgment is affirmed.


LEVY, J.

WE CONCUR:


HILL, P.J.


FRANSON, J.